# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* LENORA JONES and<br>PATRICIA J. WILLOUGHBY,<br><br>    Plaintiffs,<br><br>v.<br><br>COLLEGIATE FUNDING SERVICES, INC.,<br>*et al.*,<br><br>    Defendants. | CIVIL NO. 3:07cv290-HEH |

## REPORT AND RECOMMENDATION

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the Defendants' motion to dismiss the First Amended Complaint for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P.* 12(b)(1) and for failure to state a claim pursuant to *Fed. R. Civ. P.* 12(b)(6) (Docket No. 46). For the reasons set forth herein, it is the Court's recommendation that the Defendants' motion to dismiss for lack of subject matter jurisdiction be GRANTED in part and DENIED in part, and that Defendants' motion to dismiss for failure to state a claim be GRANTED. Because the Court concludes that amendment of the pleadings would be futile, the Court recommends that the Plaintiff-Relators be DENIED leave to

amend.[1]  Accordingly, the Court recommends that complete dispositive relief be GRANTED, and that the First Amended Complaint be DISMISSED in its entirety.

## I.  FACTUAL BACKGROUND

Plaintiff-Relators Lenora Jones ("Jones") and Patricia Willoughby ("Willoughby" or collectively with Jones, "Relators") are former employees of Defendant Collegiate Funding Services, LLC ("CFS, LLC").  (Am. Compl. ¶¶ 4, 5; Jones Aff. ¶ 2; Willoughby Aff. ¶ 2.)  Jones worked for CFS, LLC between August 2002 and July 2006, "primarily engaged in telephone solicitations of applicants for student loans," including "consolidation loans."  (Jones Aff. ¶ 2.)  Willoughby worked for CFS, LLC between 2000 and 2001 training and supervising teams of sales representatives who solicited student loan consolidation applications by telephone.  (Willoughby Aff. ¶ 2.)  Both Relators have personal knowledge related to the consolidation loan *application* process, including knowledge that specific loans that they processed were eventually approved and funded.  (Jones Aff. ¶ 3; Willoughby Aff. ¶ 4.)  Both Relators were also aware that the loans were guaranteed by the U.S. Department of Education ("DOE"), pursuant to the Higher Education Act ("HEA").  (Jones Aff. ¶ 5; Willoughby Aff. ¶ 5.)  However, neither Relator has alleged any personal knowledge of particular claims being submitted, certifications being provided, or guarantee payments being made.

---

[1]Defendant J.P Morgan Chase & Co. has also asserted that the Relators have no standing to sue it because it was not a proper party.  Because the Court's resolution of the pending motion is dispositive of all claims, any additional argument for relief is rendered moot, and the Court does not reach the standing issue.

Relators base this *qui tam*[2] action on the knowledge that they allegedly gained as telemarketers for CFS, LLC, although many of their allegations also concern Collegiate Funding Services, Inc. ("CFS, Inc."), CFS-Suntech Servicing, LLC ("CFS-Suntech"), and J.P. Morgan Chase & Co. ("Chase" or collectively with CFS, LLC, CFS, Inc., and CFS-Suntech, "CFS"). (Am. Compl. ¶¶ 4-5, 23, 28.) Throughout the Amended Complaint, Relators often allege misconduct against CFS generally, rarely distinguishing between the several defendant-entities.

As noted, while employed at CFS, LLC, Relators gained direct personal knowledge of the consolidated student loan *application* process. (Am. Compl. ¶¶ 4-5, 23, 28; Jones Aff. ¶¶ 2-5, 7; Willoughby Aff. ¶¶ 2-6, 10) (emphasis added.) The DOE guarantees payment of student loans pursuant to the Federal Family Education Loan Program ("FFELP"). (Am. Compl. ¶ 10.) If a borrower defaults on a federally-guaranteed FFELP loan, lenders such as CFS may apply for reimbursement from DOE funds by submitting a claim to a state guarantee agency. (Am. Compl. ¶ 13.) As part of the claim process, the lender must include the following certification on the claim form:

> By submitting this claim to the guarantor for reimbursement, the lender/holder certifies, to the best of its knowledge, that the information in this claim is true and accurate and that *the loan(s) included in the claim* was (were) made, disbursed (including remittance of origination fees) and serviced in compliance with all federal regulations and appropriate guarantor rules. Should the guarantor determine that the loan(s) was (were) not serviced in compliance with federal regulations and appropriate guarantor rules, *and such non-compliance results in the guarantor's inability to collect from the borrower* or in the guarantor's ineligibility for federal reinsurance on the loan(s), the lender/holder agrees to repurchase such loan(s) or refund the amount of the reinsurance loss if required by the guarantor, for value received.

---

[2]The term "*qui tam*" refers to an action brought by a private party, known as a "relator," on behalf of the United States, to recover from persons who submit false or fraudulent claims to the government. 31 U.S.C. §§ 3729-3733.

(Am. Compl. at Ex. A) (emphasis added.)  Similarly, the following certification is also required in each FFELP Federal Consolidation Loan Verification Certificate:

> Holder/Servicer Certification: (a) To the best of my knowledge and belief, the information on this form is accurate and complete; (b) Each loan listed above is a legal, valid, and binding obligation of the borrower; (c) *Each such loan* was made and serviced in compliance with all applicable laws and regulations; (d) In the case of Federal Stafford [subsidized, nonsubsidized, and unsubsidized (GSL)], Federal PLUS, Federal SLS (ALAS), Federal Consolidation, and Federal Insured Student Loans (FISL) held by the lender, the insurance on each such loan is in full force and effect; and (e) The loan amounts confirmed include only unpaid principal, unpaid accrued interest for which the borrower is responsible, late charges (as defined by federal regulations), and eligible collection costs.

(Am. Compl. at Ex. A) (emphasis added.)  Relators allege that CFS knowingly violated federal regulations in its effort to secure federally guaranteed FFELP consolidation loans, thereby making a false claim, or a false statement to secure a false claim, each time that it made such a certification.  (Am. Compl. ¶¶ 81, 85.)

**(a)      The Four "Fact Patterns" of Violations[3]**

Relators base their claims on the following four (4) fact patterns, each of which allegedly constitutes a violation of federal law governing federally subsidized student loans:

> (1)      Preferred Lender Agreements (Compl. at ¶ 20; Am. Compl. ¶¶ 21-33);
>
> (2)      Exit Counseling (Compl. at ¶ 20;  Am. Compl. ¶¶ 34-50);
>
> (3)      Misleading Direct Mail Solicitations (Compl. at ¶ 22; Am. Compl. ¶¶ 51-60); and

_____

[3]The Amended Complaint includes a fifth fact pattern which alleges violations of the so-called "single-holder rule."  (Am. Compl. ¶¶ 69-78.)  At oral argument, counsel for Relators conceded a failure to state a claim for those allegations and, therefore, the claims based thereon were withdrawn.

        (4)      Bonus Payments to CFS Employees (Compl. at ¶ 19; Am. Compl. ¶¶ 61-68).

**(1)     Preferred Lender Agreements**

Relators allege that CFS has paid "kickbacks" to colleges and universities, either with money or other incentives, in order to secure "preferred lending" status. (Am. Compl. ¶ 22.) CFS refers to these relationships with colleges and universities as "affinity partnerships." (Compl. ¶ 20; Am. Compl. ¶ 21.) As Relators explain, "preferred lender" status gives CFS a "distinct competitive advantage." (Compl. ¶ 20; Am. Compl. ¶ 21.) In addition, Relator Willoughby is allegedly "aware" that as of 2005, CFS was, for example, paying one University's alumni office (Norfolk State) $125.00 as a *quid pro quo* inducement for Federal Consolidation Loan applications. (Compl. ¶ 20; Am. Compl. ¶ 23.) As part of the arrangement, Norfolk State would provide CFS marketing materials to students and graduates, and also recommend the use of CFS's website to satisfy the graduating students' exit counseling requirements. (Am. Compl. ¶ 23.) Relators allege generally that similar agreements existed with "many other higher-education institutions." (Am. Compl. ¶ 23.)

**(2)     Exit Counseling**

As an additional inducement to secure "preferred lender" status, CFS allows schools to use its "Collegexit" program to satisfy the schools' financial aid exit interview obligation required by federal law. (Compl. ¶ 20; Am. Compl. ¶ 34.)[4] Relators have identified 177 schools

---

[4]This is the sole allegation related to exit counseling in the Relators' original Complaint. All additional allegations related to exit counseling are found only in the First Amended Complaint. This distinction is relevant because, after Relators filed the original Complaint, but before they filed the First Amended Complaint, additional public disclosures were published related to exit counseling. See Section I(b) below.

to which CFS provided exit counseling services.  (Am. Compl. ¶ 36.)  Allegedly, CFS's exit

counseling was not "personalized" to each student, as required.  (Am. Compl. ¶ 41.)

Relators plead that CFS exit counseling deceives students into believing that loan

consolidation is appropriate for everyone.  (Am. Compl. ¶¶ 42-44.)  Specifically, Relators allege

that CFS's online exit interview program provides students with a list of reasons to consolidate

their loans, but no corresponding list of reasons why loan consolidation may not be appropriate

for all students.  (Am. Compl. ¶ 42.)  However, the allegation conflicts with the contents of

Exhibit C, appended to the Amended Complaint:

> When you consolidate you will possibly lose some deferment and forbearance
> benefits.  This should be discussed with your lender/servicer or loan consolidation
> company prior to consolidating.  If you have Perkins Loans, please check to see if
> you are working in a field eligible for cancellation.[5]

(Am. Compl. at Ex. C.)

Exhibit C of the Amended Complaint also discloses that the answers and guidance

provided to students is customized based on the type of loans held by the student.  (Id.)  CFS's

exit counseling program further requires students to select a method for CFS to later contact the

student about loan consolidation.  (Am. Compl. ¶ 43.)

The school's name, logo, colors, and even mascot appear on the program materials,

giving, according to the Relators, the false impression that the school operates the "collegexit"

program.  (Am. Compl. ¶ 44.)  Accordingly, Relators allege that the website fails to disclose the

true relationship between CFS and the school involved.  (Id.)  However, on the face of the

website printouts attached to the pleadings, the association of the school with CFS is clarified by

---

[5]The "collegexit" program also lists the eligible fields of employment.  (Am. Compl. at
Ex. C.)

the following statement: "Copyright © 2007, Collegiate Funding Services, LLC."  (Am. Compl. at Ex. C.)  In addition, next to the school's name on the materials there is a link to "CFSCampusLoans."  (Id.)  Thus, CFS appears to be a distinct entity as identified on the face of the program materials.

### (3) Misleading Direct Mail Solicitations

CFS routinely forwarded direct mailings in its solicitation of applications for consolidation loans.  (Compl. ¶ 22; Am. Compl. ¶ 52.)  Relators allege that because the envelopes were stamped with the words "Federal Loan Consolidation" or "Final Notice," the recipient would misperceive that the materials were official government communications.  (Compl. ¶ 22; Am. Compl. ¶ 52.)  Indeed, Relators allege that prospective borrowers contacted them in their capacity as telemarketers to inquire about such materials.  (Am. Compl. ¶ 53.)

### (4) Bonus Payments to CFS Employees

CFS made bonus payments to its employees for soliciting and securing applications for FFELP loans.  (Compl. ¶ 19.)  Such bonus payments were based on how many loan applications were initiated by each employee.  (Compl. ¶ 19.)  For example, Relator Jones would receive a bonus of ten dollars ($10.00) for each FFELP student loan application initiated, or twenty dollars ($20.00) if the application was completed over the internet, so long as she initiated at least ten such loans on that same work day.  (Id.)  The per-application bonus would increase to fifteen dollars ($15.00), or twenty-five dollars ($25.00) for online applications, if the telemarketer initiated at least twenty such applications on a given work day.  (Compl. ¶ 19.)  Approximately five-hundred (500) similarly-employed full-time telemarketers worked for CFS at its call center in Pinellas Park, Florida.  (Compl. ¶ 19.)

**(b)     Prior Public Disclosure**

CFS alleges that fact patterns 1, 2, and 3 (Preferred Lender Agreements; Exit Counseling; and Misleading Direct Mail Solicitations) were previously disclosed to the public by way of SEC filings and news reports.  CFS has established that the following disclosures, specifically describing CFS's conduct, were made public before Relators filed the original Complaint on April 30, 2007:

(1)     A July 13, 2004 SEC Report Form S-1 for CFS, Inc. publicly disclosed CFS's use of preferred lender agreements with colleges and universities. The Report also disclosed that CFS provided exit counseling to a number of colleges and universities.  (Def.'s Br. at Ex. 1.)

(2)     A March 22, 2005 SEC Form 8-K for CFS, Inc. publicly disclosed CFS's use of "1,000+ school and affinity partnerships" that purportedly gave CFS a "[d]istinct [c]ompetitive [a]dvantage."  (Def.'s Br. at Ex. 2.)  Appended to the Form is the same document that Relators claim was supposedly "confidential."  (Am. Compl. ¶ 21.)

(3)     An April 17, 2007 New York Times news article identified JP Morgan Chase as one of several lenders that were under investigation by New York's Attorney General for allegedly providing incentives to colleges and universities that "steer" student-borrowers to CFS.  (Def.'s Br. at Ex. 6.)

(4)     An April 21, 2007 article identified CFS as one of several loan companies that provided exit counseling to colleges and universities.  (Def.'s Br. at Ex. 19.)

(5)     A March 1, 2007 U.S. News & World Report article disclosed CFS's use

of direct-mail marketing, including solicitations marked "final attempt" (in

red ink) on the envelope.  Inside the mailing, the student would find a

letter from the "Student Loan Department," marked with an insignia

allegedly designed to resemble the DOE's insignia.  The article quotes one

public interest advocate who referred to the practice as "aggressive,

sometimes misleading."  (Def.'s Br. at Ex. 26.)

In addition, the following disclosures concerning industry-wide activities were publicized

before Relators filed the original Complaint:

(1)     A February 16, 2007 Chronicle of Higher Education news article disclosed

that lenders provide financial incentives to colleges and universities that

place them in "preferred lender" status.  (Def. Br. at Ex. 3.)

(2)     A March 30, 2007 Chronicle of Higher Education news article disclosed

the New York Attorney General's intention to sue lenders who used

kickbacks to secure "preferred lender" status.  The article also explained

the use of lender call-centers to provide advice directly to students, while

appearing in the process to represent the schools involved.  (Def.'s Br. at

Ex. 4.)

(3)     A March 16, 2007 New York Times news article disclosed industry-wide

use of kickbacks and lender-controlled call-centers to secure "preferred

lender" status.  (Def.'s Br. at Ex. 5.)

(4)     An April 11, 2007 Assurance of Discontinuance publicized an agreement between lender Sallie Mae and the State of New York to cease many of the activities identical to those alleged by Relators herein.  For example, the document identified several "industry-wide findings," including the use of perks to secure "preferred lender" status, and "call centers" that allowed lenders to provide loan advice to students under the guise of representing the college or university involved.  (Def.'s Br. at Ex. 7.)

Finally, CFS has also established that the following disclosures were made to the public *after* Relators filed their original Complaint, but *before* they filed their First Amended Complaint on August 24, 2007:[6]

(1)     A series of news articles published between May 8, 2007 and August 10, 2007 identified J.P. Morgan Chase as a lender that had previously provided incentives to college alumni associations to direct alumni to them.  (Def.'s Br. at Exs. 10, 11, 12, 13, 15, 16, 17, 18)

(2)     A report published by the University of Texas on May 14, 2007 identified CFS's "Collegexit" software as a product that the University utilized to provide mandatory exit counseling.  (Def.'s Br. at Ex. 20.)  The report also disclosed that the University later dismissed its financial aid director citing, in part, the University's use of CFS's exit counseling program. (*See* news articles, Def.'s Br. at Exs. 21, 22.)

_____

[6]The Court considers any public disclosures made after the filing of the original Complaint, but before the filing of the Amended Complaint, only to the extent that they are relevant to the allegations appearing exclusively in the Amended Complaint.

(3)     Senator Edward Kennedy, as Chairman of the Senate Health, Education,

Labor and Pensions Committee, also released a report on June 14, 2007

documenting allegedly inappropriate relationships between lenders and

colleges.  The report specifically identified CFS's exit counseling

activities as an example of such inappropriate activity.  (Def.'s Br. at Exs.

23-25.)

Responding to the allegations of prior public disclosure, Relators have filed affidavits

asserting that they had never previously seen any of the documents identified as Exhibits 1-31 of

CFS's Motion to Dismiss.  (Jones Aff. ¶ 6; Willoughby Aff. ¶ 7.)  Relators further assert that

they first learned about CFS's conduct while employed as CFS telemarketers.  (Jones Aff. ¶¶ 2-5;

Willoughby Aff. ¶¶ 2-6.)  They also assert, generally, that they knew, from "personal knowledge

gained from [their] training and daily experience at CFS [and in Willoughby's case, her other

experience in the industry], that [CFS] used its loan 'servicer' entity, named 'CFS-Suntech

Servicing,' to submit claims for interest payments, guarantee default payments, and other

payments to the U.S. Department of Education for payment."  (Jones Aff. ¶ 5; Willoughby Aff. ¶

6.)  Relators assert that they gained their knowledge of CFS's actions by tracking the progress of

pending loan applications to determine whether each loan was approved and funded in order to

see if they would receive a bonus.  (Jones Aff. ¶ 4.; Willoughby Aff. ¶4.)  After reviewing

Exhibits 1 through 31 of Defendant's Brief, Relators assert, under oath, that they never

previously saw the publications at issue; nor did they rely on any of the materials to prepare their

case.  (Jones Aff. ¶ 6; Willoughby Aff. ¶ 7.)  Rather, they assert that they acquired all of the facts

that they plead from their "actual work at CFS."  (Jones Aff. ¶ 7.)

More specifically, Jones asserts that she knew that the DOE guaranteed the consolidation loans based on excerpts in training materials from CFS. (Jones Aff. ¶ 2.) She has attached an excerpt from the training materials as Exhibit A to her affidavit. (Jones Aff. at Ex. A.) However, the exhibit does not indicate that any claims were actually filed; nor does it even disclose the existence of the claim process. Indeed, it consists of nothing more than a glossary of industry terminology. (Id.) Furthermore, it is clear that Jones' job was limited to collecting information from prospective borrowers and completing their applications, not processing any claims for payment. (Jones Aff. ¶ 3.)

Between 2000 and 2001, Willoughby describes how she supervised a team of telemarketers who solicited student loan applications in the manner described by Jones. (Willoughby Aff. ¶ 2.) She asserts, without explanation, that she knew that the consolidation loans were "federally-guaranteed . . . on which interest, special allowance payments, and insurance default payments were all paid for by the [DOE] to CFS." (Willoughby Aff. ¶ 2.) She further asserts that, based on her "years of experience in the student loan industry," and her "personal knowledge," she knows that "one-hundred percent of such consolidation loans resulted in actual claims for federal money." (Willoughby Aff. ¶ 5.)[7]

To rebut the extent of Relators' alleged first-hand knowledge, CFS has submitted the Declaration of Sonja Peyton-Scott, CFS's Director of Training and Development. According to Ms. Peyton-Scott, both Relators were employed at CFS, LLC's call center in Pinellas Park,

_____

[7]At oral argument, Relators' counsel agreed that such is not, in fact, the case. Rather, he explained that only those loans on which the borrower ultimately defaulted would result in a claim being submitted. Thus, the Court understands Relators' position to be that one-hundred percent of those loans *for which CFS submitted a claim* would result in False Claims Act liability.

Florida.  (Peyton-Scott Decl. ¶¶ 4-5.)  Relators' position involved marketing CFS's student loan consolidation services to prospective applicants, and recording contact information so that CFS could forward applications to prospective borrowers.  (Peyton-Scott Decl. ¶ 6.)  The Pinellas Park call center did not service or process any consolidated loans; nor did it provide any customer service once CFS consolidated a borrower's loans.  (Peyton-Scott Decl. ¶ 7.)  Moreover, employees at the Pinellas Park call center could not access any information related to the claims for payment that CFS submitted to the government.  (Peyton-Scott Decl. ¶ 9.)  Relators have not rebutted the fact that the Pinellas Park facility had only a limited role in the consolidation loan process, or that they were employed only as telemarketers.

## II. STANDARD OF REVIEW

### A.    Subject Matter Jurisdiction

A motion made pursuant to *Fed. R. Civ. P.* 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint.  When the court's subject matter jurisdiction is challenged, the plaintiff bears the burden of proof to preserve jurisdiction.  <u>Richmond, Fredericksburg & Potomac R.R. Co. v. United States</u>, 945 F.2d 765, 768 (4th Cir. 1991).  When ruling on a 12(b)(1) motion, the Court regards the pleadings as evidence, but it may also consider evidence outside of the pleadings without having to necessarily convert the motion to one for summary judgment.  <u>Evans v. B.F. Perkins Co., a Div. of Standex Intern. Corp.</u>, 166 F.3d 642, 647 (4th Cir. 1999) (citing <u>Richmond, Fredericksburg & Potomac R.R. Co.</u>, 945 F.2d at 768).

The "public disclosure bar" divests the Court of subject-matter jurisdiction over a *qui tam* action when the relators' allegations are based upon prior public disclosures of allegations or transactions, unless the relators were the original sources of the publicized information. 31

U.S.C. § 3730(e)(4)(A)-(B).  Accordingly, once a defendant invokes the jurisdictional bar, challenging the subject matter jurisdiction of the court, a plaintiff bears the burden of proving, by a preponderance of the evidence, that the allegations supporting the subject claims were not "based upon" prior public disclosures.  United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009) (citation omitted).  Unless the relevant jurisdictional facts are "intertwined with the facts central to the merits of the dispute," the court may consider other materials than just the allegations of the complaint to resolve the jurisdictional facts in dispute, such as affidavits.  Id. at 348 (citations omitted).  Unlike a typical motion to dismiss, in which a court must accept the plaintiff's statements as true, the court may weigh and determine the disputed facts necessary to establish subject matter jurisdiction.  Thigpen v. United States, 800 F.2d 393, 396 (4th Cir. 1986), overruled on other grounds, Sheridan v. United States, 487 U.S. 392 (1988). If relators carry their burden, the analysis is concluded and the Court retains jurisdiction.  Id.  If, however, relators fail to carry their initial burden, they must then sustain the separate and distinct burden of proving that they were the original sources of the publicly available information in order to preserve the subject matter jurisdiction of the court.  Id.

**B.      Failure to State a Claim**

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Bell Atl. Corp. V. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 453 (2006).  This rule, however, is inapplicable to legal conclusions.  Ashcroft v.

Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The complaint must be "plausible on its face," meaning that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 570.

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Fed. R. Civ. P. 9(b). Malice, intent, knowledge, and any other condition of the human mind may be averred generally. Id. However, a plaintiff may not plead intent as a "bare element[]" of a cause of action. Iqbal, 129 S. Ct. at 1954. A False Claims Act relator, therefore, "must, at a minimum, describe 'the time, place, and contents of the false representations, as well as the identity of the person making the representation.'" United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (quoting Harrison v. Westinghouse Savannah River Co. 176 F.3d 776 (4th Cir. 1999) ("Harrison I")). Although the particularity demanded by Rule 9(b) varies with the distinctive facts of each case, a plaintiff who pleads fraud must set forth "the who, what, when, where, and how" before access to the discovery process can be granted. Wilson, 525 F.3d at 379 (quoting United States ex rel. Willard v. Humana Health Plan of Texas, Inc., 336 F.3d 375, 384 (5th Cir. 2003)).

### III. ANALYSIS

**A.    Subject Matter Jurisdiction**

The Court must first address the issue of subject matter jurisdiction where the resolution of the issue determines "the court's very power to hear the case." Owens-Illinoise, Inc. v. Meade, 186 F.3d 435, 442 n.4 (4th Cir. 1999). Moreover, "the absence of jurisdiction may be

raised at any time during the case, and may be based on the court's review of the evidence."

Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999).

**(1)     Prior Public Disclosures have "Triggered" the Bar**

Defendants have challenged the factual basis for subject matter jurisdiction for all of the claims arising out of fact patterns 1, 2, and 3, thus shifting the burden of proof to the Relators. As a preliminary matter, Relators challenge whether any of the allegations at issue were publicly disclosed, arguing that the reports filed with Securities and Exchange Commission ("SEC"), pursuant to SEC regulations, were not "administrative . . . report[s]" as that term is used in 31 U.S.C. § 3730(e)(4)(A).[8] Relators argue, in essence, that only reports *authored* by a government agency satisfy the statutory requirement for application of the bar. (Rel.'s Br. at 7-8.) However, existing case law does not support the argument.[9]

Indeed, the Relators cite no authority that requires government authorship to implicate the bar. Invoking the prior public disclosure bar because of a revelation in a "criminal, civil, or administrative hearing," the Fourth Circuit has held that a complaint drafted by a private party sufficiently invokes the public disclosure bar. United States ex rel. Siller v. Becton Dickinson &

---

[8]After Relators withdrew the claims based on violations of the "single-holder rule" during oral argument, counsel for CFS indicated that the Court need not rely on the SEC reports because all of the remaining allegations could be found in the prior public disclosures of various news reports. Nevertheless, the Court addresses whether it is appropriate to consider the SEC reports because the information contained therein affects the weight of Relators' evidence.

[9]Relators also challenge whether certain documents submitted by CFS truly constitute prior public disclosures on two additional grounds: (1) some documents fail to identify CFS by name; and (2) some public disclosures were made after Relators filed their original Complaint. Because those disclosures made prior to the filing of the original Complaint and identifying CFS or a related entity by name are sufficient to trigger the bar, the Court need not reach Relators' additional arguments.

Co., 21 F.3d 1339, 1350 (4th Cir. 1994). Similarly, a bid protest drafted by a private company and filed with an administrative agency has also been held to be sufficient. Grayson v. Advanced Management Technology, Inc., 221 F.3d 580, 582 (4th Cir. 2000). Based on such authority, the Fourth Circuit has never held that government authorship was required to apply the bar.

At oral argument, Relators relied heavily on Graham County Soil & Water District v. United States ex rel. Wilson, 130 S. Ct. 1396 (2010) in support of their argument for a so-called government authorship rule. In fact, in Graham County, the Supreme Court held that the term "administrative report" in the statute does not limit the public disclosure bar to federal sources alone, but that it includes state and local sources. Id. at 1405. Furthermore, the Court noted that "[i]t is the fact of 'public disclosure' – not Federal Government creation or receipt – that is the touchstone of § 3730(e)(4)(A)." Id. Rejecting the more narrow construction proposed on appeal, the Court also noted that the statute's reference to "news media" indicates that the rule has a "broader sweep." Id. at 1404. Even more of a challenge to the Relators position is the fact that the public disclosure at issue in Graham County was, in fact, authored by a *private* accounting firm hired by a local agency, and not the local government itself. Id. at 1400.

Therefore, the SEC reports at issue do constitute "administrative reports" for purposes of the public disclosure bar, and the Court will therefore consider them in evaluating whether Relators can sustain their burden of proof on the issue.

**(2)     Relators Fail to Meet their Burden of Proof**

As noted earlier, Relators' burden of proving subject matter jurisdiction for *qui tam* actions is a two-part inquiry. First, Relators must demonstrate that their claims are not "based upon" prior public disclosures. 31 U.S.C. §3730(e)(4). If the Relators carry that burden, then the

Court retains subject matter jurisdiction. Only if Relators fail to carry that burden will they then need to establish that they were "original sources" of the otherwise publicly disclosed allegations. Id.

In the Fourth Circuit, a relator must prove that they did not "actually derive[]" their allegations from public disclosure. Id. at 350; see also Siller, 21 F.3d at 1348 ("[A] relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based.") In addition to considering affidavit evidence, a court may also compare the similarities between the public disclosures and the factual allegations of the pleadings. Vuyyuru, 555 F.3d at 350-51. A relator cannot successfully carry their burden simply by showing that only part of their allegations are based upon prior public disclosures because § 3730(e)(4)'s public disclosure jurisdictional bar encompasses actions even partly based upon such disclosure. Id. at 351 (citing United States ex rel. Boothe v. Sun Healthcare Group, Inc., 496 F.3d 1169, 1176 n. 6 (10th Cir. 2007); United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1158 (2d Cir. 1993); United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir. 1992).

Attempting to meet their initial burden, Relators have submitted affidavits explaining the nature of their employment at CFS. But, neither affidavit submitted refutes CFS's assertion that Relators only worked as telemarketers or supervisors thereof, never once actually filing and processing a claim for payment from the government. (Jones Aff. ¶ 2; Willoughby Aff. ¶ 2; Peyton-Scott Decl. ¶ 9.) Rather, both Relators Willoughby and Jones simply and conclusively state that they had personal knowledge gained from "actual work at CFS." (Jones Aff. ¶7;

Willoughby Aff. ¶ 10.)  However, neither one explains *how* their work as telemarketers ever gave them access to information regarding the "preferred lender" program, "exit counseling" program, or alleged payment of kickbacks by CFS.

Relators also state that they had never seen the articles submitted by CFS in support of its motion, and, therefore, they could not have based their allegations on such disclosures.  (Jones Aff. ¶ 6; Willoughby Aff. ¶¶ 7-8.)  Essentially, Relators' evidence that they did not "rely upon" prior public disclosures consists of: (1) their own statements that they had not seen the particular disclosures submitted by the Defendants; and (2) their conclusory statements that they base their claims on knowledge obtained as CFS telemarketers.  (Id.)

At oral argument on the instant motion, counsel for Relators submitted his own declaration to establish that he did not rely on any of the subject public disclosures when drafting the original Complaint, or the Amended Complaint, for the Relators.  (Pigott Decl. ¶ 4.) Although the declaration does not explicitly identify the sources of counsel's knowledge, the declaration indicates, and the Court accepts as true, that counsel relied upon "relevant document[s] and . . . interviews with both of the persons now serving as Relators."  (Id. ¶ 2.) The declaration also includes the statement that counsel received one of the public disclosures at issue (Def.'s Ex. 11) from a Mr. Matusheski, co-counsel for the Relators, on or about May 12, 2008, after the original complaint was filed on April 30, 2007.  (Id. ¶ 5.)  While the Court accepts counsel's declaration as being truthful, the representations therein do nothing to prove that the Relators, or Mr. Matusheski for that matter, did not rely on the prior public disclosures to provide the information in support of counsel's drafting efforts.  Indeed, counsel's declaration indicates that Mr. Matusheski was keenly aware of the prior disclosures that were reported in the

19

press.  (Id. at Ex. A-1.)  The declaration does not, however, inform the Court as to when Mr.

Matusheski first learned of those disclosures, giving rise to the inference that he was, at all times,

aware of the prior public disclosures and utilized them to help formulate the allegations in the

case.

Based on the lack of necessary detail in the Relators' affidavits, as well as the insufficient

revelations in the declaration of counsel, the Court concludes that the Relators have not met their

burden of proof on the initial issue involving the public disclosure bar.[10]  Moreover, other

evidence weighs heavily against Relators' position.  First, Ms. Peyton-Scott's declaration asserts

that both Relators were terminated for cause; have previously filed employment-based lawsuits

against CFS; and have never had any access to the claims process that is at the core of Relators'

qui tam allegations.  (Peyton-Scott Decl. ¶¶ 4, 5, 7-9.)  Significantly, Relators did not refute those

representations in their affidavits - they simply state, in conclusory fashion, that they learned of

the existence of the basis for their claims while telemarketers at CFS.  (Jones Aff. ¶ 7;

Willoughby Aff. ¶ 10.)  The failure to explain how Relators obtained such information in their

employment weighs heavily against crediting their position with any veracity.  See, e.g., United

States ex rel. Ackley v. IBM, 76 F. Supp. 2d 654, 659 (D. Md. 1999) (citing Thigpen, 800 F.2d at

396).

Similarities between the Relators' pleadings and the public disclosures, although not

dispositive, also weigh against the credibility of their assertions.  See, e.g., Vuyyuru, 555 F.3d at

---

[10]It is proper for the Court, rather than a jury, to resolve the factual dispute in the instant
case because the jurisdictional facts are not "intertwined with" an "essential element" of the FCA
claims.  Vuyyuru, 555 F.3d at 348 (citing Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)).
Indeed, Relators have not argued as much, instead relying on the weight of their affidavits to
support a finding of subject matter jurisdiction.

350-51.  Although the Relators' allegations are not precisely identical to the information contained in the public disclosures, Relators cannot carry their burden simply by demonstrating that only part of their allegations are based upon the prior public disclosures.  Id. at 351-52 (citations omitted).

For example, Relators specifically identify a "Confidential Investor Presentation" to demonstrate that the payment of incentives were used to secure "preferred lender status."  (Am. Compl. ¶ 21.)  The document, in its entirety, was publicly disclosed in an SEC filing of March 22, 2005.  (Def.'s Br. at Ex. 2.)  The Relators' affidavits fail to explain how they obtained the presentation, leading to the logical inference that Relators, or their counsel, obtained the document from the SEC database.  Asked about the matter at oral argument, counsel explained only that the Relators themselves obtained the document while employed as CFS telemarketers; he did not explain exactly how, or when, they obtained it.  Similarly, Relators plead that Relator Willoughby "is aware" of an incentive agreement that CFS and Norfolk State University entered into in 2005, without indicating how she could have learned of the agreement four years after she left the company.  (Am. Compl. ¶ 23; Willoughby Aff. ¶ 2.)  Addressing the allegation of possible falsification at oral argument, counsel for the Relators stated generally, and in only conclusory fashion, that Willoughby learned about the Norfolk State agreement from unidentified sources in the industry.  Where the burden of proof lies firmly on the Relators, and yet they fail to identify even the sources of their challenged information, little weight can be attributed to their argument(s).

As another example of the striking similarities between the pleadings and the prior public disclosures, Relators include an extensive list of colleges and universities that have accepted exit

counseling from CFS. (Am. Compl. ¶ 37.) Many of the schools identified in the public disclosures are likewise identified in Relators' list, including, for example, the University of Texas, Capella University, the State Universities of New York, and Drexel University. (Compare Am. Compl. ¶ 37 with Def.'s Br. at Exs. 3, 4, 6, 15, 19, 20, 21, 22, 23, 24, 25.) Again, Relators' conclusory statements that they obtained this information while in CFS's employment, and happened to remember it years later, strains credibility. (Jones Aff. ¶ 7; Willoughby Aff. ¶ 9.) The Amended Complaint names nearly two-hundred schools (Am. Compl. ¶ 37.) If such information was readily accessible to Relators in their capacity as telemarketers, they should be able to bolster their credibility by explaining how they obtained this information and were able to retain it several years later. They have not done so and, without such further explanation, Relators cannot carry their burden of proving that their allegations related to "exit counseling" were not, at least in part, based upon the prior public disclosures.

However, at the same time, the Relators meet their burden as to the first prong of the analysis as to the "direct mail marketing" fact pattern. In their Amended Complaint, Relators explain that borrowers would call them after receiving the direct mail materials at issue. (Am. Compl. ¶ 53.) CFS allegedly trained them to respond to questions about any relationship with the federal government by simply responding that CFS was "licensed and backed by the federal government." (Id.) Defendants' submissions do not contradict the Relators' assertions that some prospective borrowers would telephone the Pinellas Park facility after receiving the direct mail marketing materials and inquire about the representations contained in the materials. Such assertions are unrefuted and credible, and, therefore, Relators sustain their burden as to fact pattern 3 concerning whether they based their claims on prior public disclosures.

Where Relators fail to carry their burden to show that fact patterns 1 and 2 were not based, at least in part, on prior public disclosures, the Court must now consider the second prong of the inquiry; namely, whether the Relators were "original sources" of the public disclosures. 31 U.S.C. § 3730(e)(4)(A). As previously noted, the Court retains jurisdiction over fact patterns 1 and 2 only if the Relators can prove, by a preponderance of the evidence, that they were "original sources" of the publicly disclosed information. Id. To be an original source, a relator must demonstrate that they possessed "direct and independent knowledge" of the publicly disclosed information. 31 U.S.C. § 3730(e)(4)(B). For the reasons already discussed above, the Relators cannot establish that they were "original sources." Indeed, it is the Relators' lack of convincing evidence of "direct and independent knowledge" that weighs against their credibility in determining whether or not they have actually relied upon the prior public disclosures in asserting their claims.

The Court therefore recommends that counts 1-6 and 16-19, which are based upon fact patterns 1and 2, be dismissed for lack of subject-matter jurisdiction pursuant to the public disclosure bar.

**B.     Failure to State a Claim**

Defendants also seek dismissal of all claims pursuant to Fed. R. Civ. P. 12(b)(6) and the heightened pleading standards of Rule 9(b).[11] Because False Claims Act cases essentially "sound" in fraud, Rule 9(b)'s heightened pleading standards apply. See Wilson, 525 F.3d at 379

---

[11]Defendants have moved to dismiss all claims under Fed. R. Civ. P. 12(b)(6). However, because the Court recommends that claims based on fact patterns 1 and 2 be dismissed for lack of subject-matter jurisdiction, the Court only addresses the Rule 12(b)(6) motion as it relates to fact patterns 3 and 4.

(citations omitted).  Defendants challenge the sufficiency of Relators' pleadings on a number of grounds, the most convincing of which is the failure to sufficiently identify any single false claim that was submitted to the government.  (Def.'s Br. at 22-24.)[12]

The Supreme Court has cautioned that the False Claims Act was not designed to punish every type of fraud committed upon the government.  See United States v. McNinch, 356 U.S. 595, 599 (1958).  "The statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the '*claim for payment*.'"  Harrison I, 176 F.3d at 785 (quoting United States v. Rivera, 55 F.3d 703, 709 (1995)) (emphasis added).  A central question then is whether the defendant ever presented a "false or fraudulent claim" to the DOE.  Id.  That is, was there "a call upon the government fisc?"  Id.

A "claim" under the False Claims Act "means any request or demand . . . for money or property" where the government provides "any portion of the money or property" to a "contractor, grantee, or other recipient," or if the government will "reimburse such contractor, grantee or other recipient" for any portion thereof.  31 U.S.C. § 3729(b)(2).  Stated simply, the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq*., requires the presence of a claim for liability to attach.  Harrison I, 176 F.3d at 785.

---

[12]Defendants also argue that Relators fail to state a claim for the following reasons: (a) Relators failed to plead with particularity examples of express false certifications; (b) Relators failed to plead with particularity that certifications of compliance were material; (c) Relators' allegations of *per se* liability cannot circumvent Rule 9(b)'s requirements; (d) Relators failed to plead with particularity that the underlying conduct (i.e. fact patterns 1 through 5) were violations of the HEA; (e) Relators failed to plead a conspiracy with particularity; (f) bonus payments or referral fees on a per application basis are not unlawful; (g) lender-provided exit counseling is not unlawful; and (h) soliciting a borrower covered by the single-holder rule is not unlawful. Because the Court concludes that all remaining claims should be dismissed based on the Respondents' failure to allege a single submission of a false claim, the Court need not address the additional defense arguments.

Liability for a false certification will ensue only if compliance with statutes or regulations is a *prerequisite* for obtaining a benefit, and the defendant affirmatively certifies such compliance. Id. At 787. The prerequisite standard in false certification cases is essentially a heightened materiality requirement. Id. At 793. The government must therefore condition payment of the subject claim upon certification of compliance with the provisions of the statute or regulation at issue. Id. (citations omitted). Materiality in this context is thus a mixed question of law and fact. Id. at 785 (citations omitted). The factual assertions of materiality must be accepted as true in accordance with Rule 12(b)(6) standards. Id. at 793. Legal conclusions, however, are to be discarded. See Iqbal, 129 S. Ct. at 1949.[13]

Some courts have held that when there is a government-insured loan, as here, a claim is subject to the False Claims Act only when the borrower defaults and the government is obligated to make payment. See United States ex rel. Graves v. ITT Educational Services, Inc., 284 F. Supp. 2d 487, 495-96 (S.D. Tex. 2003) (citing Rivera, 55 F.3d at 710; United States v. Vanoosterhout, 898 F. Supp. 25, 29 (D.D.C. 1995)). Although the Fourth Circuit has not addressed the rule, it logically follows that no claim exists in regard to government-insured loans unless and until a default generates a request for the indemnification of a guarantee. See 31

---

[13]Because the failure to plead any details of the actual claims or asserted false statements is fatal, the Court does not need to further analyze the related materiality issue. Moreover, the language in the certification on the claim form attached to Relators' Amended Complaint suggests that a misrepresentation *is not* material. If the "loan(s) was (were) not serviced in compliance with federal regulations and appropriate guarantor rules, *and such non-compliance results in the guarantor's inability to collect* from the borrower . . . the lender/holder agrees to repurchase such loan(s) or refund the amount of the reinsurance loss." (Am. Compl. at Ex. A.) The certification therefore indicates that the guarantor must first fail to collect from the borrower before such a misrepresentation becomes material. In any event, the issue does not have to be addressed further.

U.S.C. § 3729(b)(2) (defining the term "claim" to include, among other things, "any request or demand" for money).

Citing a series of cases from other federal appellate circuits, Relators assert that they do not need to plead that specific claims were submitted because they have alleged corporate-wide conduct of false certifications and have demonstrated personal knowledge that "false certifications were indeed used to get legally false claims paid." (Rel.'s Br. at 24.) However, Relators' pleadings are devoid of any factual allegations of the claims process, and, accordingly, their purported "personal knowledge" amounts to nothing more than a conclusory statement that is insufficient to sustain their argument. See Iqbal, 129 S. Ct. at 1949.

Even assuming that Relators have demonstrated "personal knowledge," that would not relieve them from the pleading obligations of Rule 9(b). Relators cite absolutely no authority from the Fourth Circuit in support of their claim that they do not need to identify the particulars of any claims. Rather, they rely on language from other jurisdictions, particularly the Sixth, Seventh, and Eleventh Circuits. Still, not one of those courts have authorized a relator to simply plead the submission of a false claim as generically as the Relators have done.

For example, in United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849 (7th Cir. 2009), the Seventh Circuit reversed the district court for dismissing a lawsuit on Rule 9(b) grounds. In that case, the relator identified five specific contracts, specific dates of shipment, and related the details of specific payments. Id. at 853-54. The district court found that such allegations were not enough because the relator did not also plead the specific details of the requests for payment. Id. at 854. Reversing the district court, the Seventh Circuit held that it was not "essential for a relator to produce the *invoices*" themselves, but that the failure to do so

26

did not relieve the relator of the obligation to plead specific false claims.  Id. (emphasis added).

Indeed, the Court noted that "it is essential to show a false statement," while recognizing that the

showing can be made by inference from the specific contracts, dates, and payments in the

pleadings.  Id.

Lusby offers no support to the Relators' argument because they have failed to identify any

specific defaults, payments, dates, or other indicia from which a specific claim for payment can

be reasonably inferred to have been submitted.  It is quite plausible that CFS did not submit

claims to DOE for some defaulted loans.  It is equally plausible that some consolidation loans

held by CFS originated independently from the allegedly unlawful conduct, and therefore never

resulted in a false certification of compliance as to those particular loans.  Because the Relators

provide no details of submitted claims, the Court cannot reasonably infer the existence or extent

of any false claims having been submitted.

Relators similarly cite United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180 (5th Cir.

2009) in an attempt to remedy their failure to plead any essential details of a false claim.  But, as

the Fifth Circuit held in that case:

> [T]o plead with particularity the circumstances constituting fraud for a False
> Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details
> of an actually submitted false claim, may nevertheless survive by alleging
> *particular details of a scheme to submit false claims* paired with reliable indicia
> that lead to a strong inference that claims were *actually submitted*.

Id. at 190 (emphasis added).  The Grubbs court went on to explain:

> Confronting False Claims Act defendants with both an alleged scheme to submit
> false claims and details leading to a strong inference that *those claims were
> submitted--such as dates and descriptions* of recorded, but unprovided, services
> and a *description of the billing system* that the records were likely entered
> into–gives the defendants adequate notice of the claims.

Id. at 190-91 (emphasis added).

In Grubbs, the relator was a psychiatrist who reported that his hospital was filing false medicare and medicaid claims for "face-to-face" hospital visits when, in fact, the treatment never occurred. Id. at 184. The relator alleged the details of a specific attempt by a nurse to engage in such conduct when the relator was employed during a weekend shift at the same hospital. Id. In addition, the relator pleaded at least one overt act of false billing by each doctor involved, including the date, code number, and an explanation of why that specific billing was false. Id. at 185. Indeed, such details were sufficient to satisfy the standards of Rule 9(b). In this case, however, the Relators have not provided such detail. Indeed, even the Amended Complaint contains no dates, claim numbers, or identities of individuals who allegedly submitted claims. The only details plead relate to asserted violations of the HEA and DOE regulations – not to the submission of false claims subject to those regulations.[14]

Finally, Relators rely on a single footnote in United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493 (6th Cir. 2007) (en banc) for the proposition that Rule 9(b) does not require any specifics of a false claim. (Rel.'s Br. at 29 (citing Bledsoe, 501 F.3d at 504 n. 12).) Relators' reliance on the footnote is misplaced, given the Sixth Circuit's explicit

---

[14]The Grubbs court also explained that the requirements of 31 U.S.C. § 3729(a)(1) are distinct from those of 31 U.S.C. § 3729(a)(2). Under § 3729(a)(1), there must be a "presentment" of a claim. No such requirement exists under § 3729(a)(2), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." Grubbs, 565 F.3d at 192. Accordingly, a relator might plead a claim under subsection (a)(2) even if a *submission of a claim* is not plead with particularity. Id. That does not, however, "excuse" a relator from Rule 9(b)'s pleading requirements when alleging "a false record or statement," the particulars of which are lacking in this case.

statement that "[w]e hold that pleading *an actual false claim* with particularity is an *indispensable element* of a complaint that alleges a FCA violation in compliance with Rule 9(b)." Id. at 504 (emphasis added). The footnote explains only that the Sixth Circuit does "not intend to foreclose the *possibility* of a court relaxing this rule." Id. at 504 n. 12 (emphasis added). Indeed, that same footnote cites Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 876 (6th Cir. 2006) for the proposition that "[A]lthough courts have permitted allegations of fraud based upon 'information and belief,' the complaint 'must set forth a factual basis for such belief,' and the allowance of 'this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" Id. at 878 (citations omitted). Here, the Relators' allegations that CFS submitted false claims, or made false statements, are only conclusory, with no details of any specific occurrence being plead.[15]

The present case illustrates the importance of Rule 9(b) in the context of FCA claims. When there is a government-insured loan, a valid claim pursuant to the False Claims Act is viable only when a borrower defaults and the government must indemnify as guarantor. See Graves, 284 F. Supp. 2d at 495-96 (citations omitted). Here, the certifications at issue do not attest to full compliance with federal law and regulations. Instead, the certifications state only that "the loan(s) included in the claim" or "each such loan" complied with federal law. (Am. Compl. Exs. A, B.) Therefore, each claim submission certified compliance only as to a particular

---

[15]Approximately two weeks before oral argument, Relators supplemented their opposition to the motion by filing two recent slip opinions from the 10th and 9th Circuits. United States ex rel. Lemmon v. Envirocare of Utah, Inc., No. 09-4079 (10th Cir. August 4, 2010); United States ex rel. Ebeid v. Lungwitz, No. 09-16122 (9th Cir. August 9, 2010). The Court has considered the cases and, for much of the same reasons to distinguish Lusby, Grubbs, and Bledsoe, concludes that they also offer an insufficient basis to dispense with the requirements of Rule 9(b).

loan.  Here, there is no way to associate any particular defaulted loan to a particular claim because of the general nature of the allegedly unlawful conduct by CFS as plead, and the failure of the Relators to otherwise plead a claim with sufficient specificity.  The essential element of any false claim is therefore absent from Relators' allegations, even as amended.

Because the Relators do not identify a single, actual false claim submitted or false statement made by CFS, they could satisfy the requirements of *Fed. R. Civ. P.* 9(b) only by alleging, at the very least, some details of the claims process.  They have not done so, and their conclusory statements that false claims were submitted are insufficient.  Therefore, the Court recommends that counts 7-12 and 20-21, that are based on fact patterns 3 and 4, be dismissed.

**C.      Leave to Amend**

Where the Relators have already amended their pleading once, it now requires leave of Court to file an additional amended pleading that addresses the deficiencies discussed herein. *Fed. R. Civ. P.* 15(a)(2).  Although Rule 15(a)(2) instructs the Court to "freely give leave when justice so requires," the Court "may deny leave if amending the complaint would be futile." Wilson, 525 F.3d at 376 (citation omitted).

Relators candidly admit that they do not possess the information that is necessary in order to allege those details regarding the claims process necessary to satisfy the particularity requirement of Rule 9(b).  (Rel.'s Br. at 28-29.)  While the Court recognizes that the Relators lack knowledge about the claims process "through no fault of their own," that does not relieve them of the requirement that they plead their case with particularity pursuant to *Fed. R. Civ. P.* 9(b).  (Rel.'s Br. at 29.)  The Court therefore recommends a finding that it would be futile to grant the Relators leave to further amend and, therefore, that leave to amend be denied.

## IV.  CONCLUSION

For the reasons discussed herein, it is the recommendation of this Court that the

Defendants' motion to dismiss for lack of subject matter jurisdiction (Docket No. 46) be

GRANTED as to Counts 1, 2, 3, 4, 5, 6, 16, 17, 18, and 19 and DENIED as to Counts 7, 8, and 9.

This Court further recommends that the Defendants' motion to dismiss for failure to state a claim

be GRANTED as to Counts 7, 8, 9, 10, 11, 12, 20, and 21, and that leave to amend as requested

by the Relators be DENIED, resulting in the DISMISSAL of the First Amended Complaint in its

entirety and with prejudice.[16]

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry

E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a _de novo_ review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated: September 21, 2010

---

[16]Counts 13, 14, and 15 are to be dismissed because they arise out of fact pattern 5 ("single-holder rule"), which, during oral argument, Relators conceded they failed to plead sufficiently.