# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA *ex rel.*
LENORA JONES and PATRICIA J.
WILLOUGHBY,

         Plaintiffs,

    v.

COLLEGIATE FUNDING SERVICES,
INC., COLLEGIATE FUNDING
SERVICES, LLC, CFS-SUNTECH
SERVICING LLC, and J.P. MORGAN
CHASE & CO.,

         Defendants.

Civil Action No. 3:07CV290–HEH

## MEMORANDUM OPINION

This *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, is

presently before the Court on the Report and Recommendation (R&R) of the Magistrate

Judge and objections thereto by Plaintiff-Relators and Defendants. For the reasons stated

below, this Court will adopt the R&R with the exception that Counts 16–19 will be

dismissed for failure to state a claim. Accordingly, Counts 1–6 will be dismissed for lack

of subject matter jurisdiction; Counts 7–12 and 16–21 will be dismissed for failure to

state a claim; and Relators' First Amended Complaint ("Amended Complaint") will be

dismissed in its entirety. Because further amendment of the pleadings would be futile,

Relators will be denied leave to amend.

Collegiate Funding Services, LLC ("CFS") is a private commercial lender authorized to make post-secondary education loans pursuant to the Federal Family Education Loan Program ("FFELP"). Plaintiff-Relator Patricia Willoughby ("Willoughby") worked for CFS as a telemarketer from October 2000 until her termination in June 2001. (*See* Pls.'/Relators' Resp. Opp'n Def.'s Mot. Dismiss [hereinafter Relators' Opp'n Mot. Dismiss] Ex. 4 [hereinafter Willoughby Aff.] ¶ 2; Mem. Supp. Def.'s Mot. Dismiss Ex. 29 [hereinafter Peyton-Scott Decl.] ¶ 4.) Similarly, Plaintiff-Relator Lenora Jones ("Jones") worked for CFS as a telemarketer from August 2002 until her termination for cause in July 2006. (Relators' Opp'n Mot. Dismiss Ex. 3 [hereinafter Jones Aff.] ¶2; Peyton-Scott Decl. ¶ 5.) In their positions as telemarketers, Jones and Willoughby (collectively, "Relators") solicited student-loan consolidation applications on behalf of CFS.[1] (Willoughby Aff. ¶2; Jones Aff. ¶ 2.)

Relators were apparently aware that the FFELP loans for which they sought consolidation applications were guaranteed by the United States Department of Education ("DOE"), and that lenders such as CFS could submit to the DOE claims for reimbursement when borrowers defaulted on federally-guaranteed loans. (Jones Aff. ¶ 2; Willoughby Aff. ¶ 5.) In each such FFELP claim form, lenders were required to certify that all information in the claim was "true and accurate and that the loan(s) in the claim

---

[1] Consolidation loans are designed to help borrowers simplify loan repayment by combining different types of federal student loans. Essentially, a commercial lender known as the "consolidating lender" pays the outstanding balances on a borrower's existing federal loans. The borrower is then indebted to the consolidating lender for a single loan with a single repayment schedule. *See* 20 U.S.C. § 1078-3.

was (were) made, disbursed. . . and serviced in compliance with all federal regulations and appropriate guarantor rules."[2] (Am. Compl. Ex. A.) Similarly, in each FFELP Federal Consolidation Loan Verification Certificate—which federal regulations required loan holders/servicers to submit to consolidating lenders when borrowers submitted federal consolidation loan applications—included a certification that the information in the form was accurate and complete, and each loan listed on the form "was made and serviced in compliance with all applicable laws and regulations."[3] (Am. Compl. Ex. B.)

---

[2] The certification provided:

> By submitting this claim to the guarantor for reimbursement, the lender/holder certifies, to the best of its knowledge, that the information in this claim is true and accurate and that the loan(s) included in the claim was (were) made, disbursed (including remittance of origination fees) and serviced in compliance with all federal regulations and appropriate guarantor rules. Should the guarantor determine that the loan(s) was (were) not serviced in compliance with federal regulations and appropriate guarantor rules, and such non-compliance results in the guarantor's inability to collect from the borrower or in the guarantor's ineligibility for federal reinsurance on the loan(s), the lender/holder agrees to repurchase such loan(s) or refund the amount of the reinsurance loss if required by the guarantor, for value received.

(Am. Compl. Ex. A.)

[3] Before a lender may process a consolidation loan, it must first obtain a Loan Verification Certificate from the holders of the borrower's existing loans. *See* 20 U.S.C. § 1078-3; 34 C.F.R. § 682.206(f). The Loan Verification Certificate attests to the accuracy of the loan data, including the principal balance, interest rate, and payoff amount. (*See* Am. Compl. Ex. B.) Additionally, the existing loan holder/servicer is required to certify that:

> (a) To the best of my knowledge and belief, the information on this form is accurate and complete; (b) Each loan listed above is a legal, valid, and binding obligation of the borrower; (c) Each such loan was made and serviced in compliance with all applicable laws and regulations; (d) In the case of Federal Stafford [subsidized, nonsubsidized, and unsubsidized (GSL)], Federal PLUS, Federal SLS (ALAS), Federal Consolidation, and Federal Insured Student Loans (FISL) held by the lender, the insurance on each such loan is in full force and effect; and (e) The loan amounts confirmed include only unpaid principal, unpaid accrued interest for which the borrower is responsible, late charges (as defined by federal regulations), and eligible collection costs.

(*Id.*) Once the certificate is completed and returned, the consolidating lender completes the transaction and becomes the holder of the consolidation loan. *See* 20 U.S.C. § 1078-3.

On April 30, 2007, Relators filed this *qui tam* action alleging that CFS and its

affiliated entities[4] violated federal regulations in an effort to secure federally-guaranteed

FFELP consolidation loans, and thus CFS's submission of the aforementioned

certifications constituted false claims, in violation of the False Claims Act ("FCA"), 31

U.S.C. § 3729 *et seq.*[5] Relators filed an Amended Complaint on August 24, 2007,

asserting the same general causes of action with some factual discrepancies in the details.

Relators base their claims on four patterns of practice, each of which allegedly

violated provisions of the Higher Education Act ("HEA") concerning federally-

subsidized student loans.[6] First, Relators allege that CFS entered into unlawful preferred-

---

[4] Relators sued CFS, LLC; CFS, Inc. (CFS, LLC's then-parent company); CFS-Suntech Servicing, LLC (CFS, LLC's wholly-owned subsidiary); and JPMorgan Chase & Co., which allegedly had at that time an agreement with CFS to maintain and facilitate the marketing and lending schemes alleged in this action. Relators' Amended Complaint often refers to CFS generally, without distinguishing between the several Defendants.

Since the filing of Relators' Complaint, JPMorgan Chase Bank, N.A. has acquired ownership of CFS, LLC, and an entity known as ACS Education Services, Inc. has acquired CFS, Inc. and CFS-Suntech. In this opinion, the parties are referred to as they existed when Relators filed suit.

[5] Specifically, Relators assert that Defendants are liable for: (1) knowingly presenting or causing to be presented to the government a false claim for payment or approval; (2) knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government; (3) conspiring to defraud the government by getting a false or fraudulent claim allowed or paid; and (4) knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)–(3).

Although Congress amended the FCA, including § 3729(a)(2), in 2009 and such changes were made retroactive to June 7, 2008, Pub. L. No. 111-21, 123 Stat. 1621 (May 20, 2009), this case is governed by the text of § 3729(a)(2) as it existed when Relators filed suit because Relators' Amended Complaint involves only claims allegedly submitted before June 7, 2008. *See United States v. Sci. Applications Int'l Corp.*, 653 F. Supp. 2d 87, 106–07 (D.D.C. 2009).

[6] Counts 1–3 of Relators' Amended Complaint are based on fact pattern one; Counts 4–6 are based on fact pattern two; Counts 7–9 are based on fact pattern three; and Counts 10–12 are based on fact pattern four. Relators also alleged in their Amended Complaint a fifth pattern of practice concerning violations of the so-called "single-holder rule," but Relators withdrew those claims (Counts 13–15) at oral argument before the Magistrate Judge.

lender agreements with colleges and universities, whereby CFS paid monies and inducements to colleges and universities in order to secure "preferred lender" status. (Am. Compl. ¶ 22.) In exchange, the schools allegedly steered their students toward CFS for loan applications and exit counseling, and generally promoted and marketed CFS as a "preferred lender." (*Id.*) In Relators' view, this conduct violated the HEA's anti-inducement provision, which prohibited a lender from offering, "directly or indirectly, points, premiums, payments, or other inducements, to any educational institution or individual in order to secure applicants for [FFELP] loans." 20 U.S.C. § 1085(d)(5)(A) (2007).[7]

Second, Relators allege that CFS entered into agreements with 177 colleges and universities, pursuant to which CFS agreed to undertake, at CFS's expense, the schools' statutory duty to provide personalized exit loan counseling to graduating students. (Am. Compl. ¶ 36.) Relators contend that this, too, violated the HEA's anti-inducement provisions. (*Id.*) Relators further allege that CFS failed to provide "personalized" exit counseling as required by law, instead deceiving students into believing that loan consolidation was appropriate for everyone. (*See* Am. Compl. ¶¶42–44.) Specifically, Relators allege that CFS's online exit interview program, "Collegexit," provided students

---

Counts 16–21 are dependent on the various fact patterns. Specifically, Counts 16 and 17, which allege presentation of false claims for insurance guaranty payments and presentation of false claims for loan interest and special allowance payments, incorporate fact patterns one through four. Counts 18 and 19, which allege conspiracy to get false insurance claims paid and conspiracy to get false interest and special allowance claims paid, are based upon fact patterns one through three. Counts 20 and 21, discussed *infra* at Part III.A.iv, incorporate generally all four fact patterns.

[7] Since Relators filed their Amended Complaint, the HEA's anti-inducement provision has twice been amended. *See* Pub. L. No. 110-315, 122 Stat. 3253 (Aug. 14, 2008); Pub. L. No. 111-39, 123 Stat. 1940 (July 1, 2009). This opinion refers to the HEA as it existed in 2007.

with a list of reasons to consolidate their loans, but no corresponding list of reasons why loan consolidation might not be appropriate. (Am. Compl. ¶ 42.) Relators also claim that CFS used the relevant school's name, logo, colors, and mascot in its Collegexit program to give the false impression that the school operated the exit counseling program. (Am. Compl. ¶ 44.)

Third, Relators allege that CFS engaged in misleading advertising via direct mail solicitations to college students and graduates. (Am. Compl. ¶ 52.) Relators allege that CFS marked the mailings with the words "Federal Loan Consolidation" and "Final Notice" to foster the misimpression that the mailings were from the federal government. (*Id.*) Relators allege that CFS trained its telemarketers, including Relators, to represent that CFS was "licensed and backed by the federal government" when recipients called to inquire about the mailings. (Am. Compl. ¶ 53.)

Finally, Relators allege that CFS violated the HEA's anti-inducement provision by offering and making illegal bonus payments to its employees based on the number of FFELP student-loan applications initiated daily by the respective employee. (Am. Compl. ¶ 61–62.)

In addition to alleging that these purported HEA violations rendered false CFS's certifications, Relators contend that CFS-Suntech is *per se* liable under the FCA because it violated the aforementioned HEA and FFELP regulations while designated for exceptional performance. *See* 20 U.S.C. § 1078-9(g) (2006) (providing that lenders and servicers designated for exceptional performance that failed to comply with FFELP regulations "shall be considered in violation of" 31 U.S.C. § 3729). Relators allege that

CFS, Inc. and CFS, LLC conspired with CFS-Suntech to commit these violations. (Am. Compl. ¶¶ 32–33.)

On May 25, 2010, Defendants moved to dismiss Relators' Amended Complaint.[8] Defendants contend that this Court lacks subject matter jurisdiction over the claims arising out of fact patterns one through three because Relators' allegations are based upon prior public disclosures—namely, a series of news articles which detailed New York Attorney General Andrew Cuomo's investigation of the student-loan industry, other mainstream news reports about the practices of CFS and JPMorgan in particular, and CFS's publicly-available SEC filings. Thus, Defendants claim, these counts are barred by the FCA's so-called public disclosure bar, codified at 31 U.S.C. § 3730(e)(4)(A)–(B). In the alternative (and in the first instance as to fact pattern four), Defendants contend that Relators have not pleaded their allegations of fraud with sufficient particularity, and thus the claims should be dismissed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Central to Defendants' argument is the fact that, although Relators claim to have independent knowledge of the alleged preferred-lender agreements, exit-counseling agreements, and misleading direct mail solicitations, Relators worked as mere telemarketers with no access to information concerning the alleged illegal practices. (*See* Peyton-Scott Decl. ¶¶ 6–12.) Likewise, although Relators claim that Defendants submitted false claims for reimbursement of consolidation loans, Relators did not service

---

[8] Although Relators filed this action in 2007, the United States did not give notice of its election to decline intervention until March 2010. The Honorable Richard L. Williams recused himself from the case on May 24, 2010, and the action was then reassigned to this Court.

or process any consolidated loans, provide any post-consolidation customer service, or have access to information regarding claims for government reimbursement submitted by CFS. (*See id.* at ¶¶ 7, 9.)

Relators do not dispute the limited role of the facility at which they were employed, nor do they dispute the duties they performed as telemarketers. (*See* Jones Aff. ¶ 3; Willoughby Aff. ¶ 2.) Rather, Relators retort in sworn affidavits that they had not previously seen the SEC filings, news reports, or other public disclosures cited by Defendants. (*See* Jones Aff. ¶¶6–7; Willoughby Aff. ¶¶7–10.) Relators maintain that they learned of the allegations underlying their Amended Complaint through their work at CFS and, in Willoughby's case, through her other work in the student-loan industry. (*See* Jones Aff. ¶ 5; Willoughby Aff. ¶ 5.) Relators have not, however, addressed whether their attorney, Timothy Matusheski, gleaned information from prior public disclosures.

In a thorough and well-reasoned Report and Recommendation ("R&R") entered on September 21, 2010, Magistrate Judge Dohnal concluded that Relators failed to prove that their allegations underlying fact patterns one and two (concerning preferred-lender and exit-counseling agreements) were not actually derived from prior public disclosures. Accordingly, he recommended dismissal of Counts 1–6 and 16–19 for lack of subject matter jurisdiction. (R&R 23.)

As to fact patterns three and four, Judge Dohnal concluded that Relators established subject matter jurisdiction, but nevertheless recommended dismissal of the corresponding counts (7–12 and 20–21) for failure to state a claim. (R&R 30.) Thus,

because Relators withdrew Counts 13–15 at oral argument, Judge Dohnal recommended dismissal of the Amended Complaint in its entirety. Judge Dohnal concluded that amendment would be futile because Relators candidly admitted that they lacked sufficient additional information to satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. (*Id.*) Accordingly, Judge Dohnal recommended that the First Amended Complaint be dismissed in its entirety with prejudice, without leave to amend. (*Id.*)

Defendants ask this Court to adopt the R&R, with the exception that Counts 7 through 9 and Counts 20 and 21 be dismissed for lack of subject matter jurisdiction rather than for failure to state a claim. (Def.'s Objections R&R [hereinafter Def.'s Objections], at 2.)

Relators, on the other hand, object to the R&R in almost all respects. Specifically, Relators contend that Judge Dohnal erred by: (1) requiring them to show that they derived their allegations entirely from personal knowledge gained through their work at CFS; (2) finding that CFS's SEC filings are "administrative reports" within the meaning of the FCA's public disclosure bar; (3) finding that Relators "actually derived" their allegations from government reports or news articles; (4) finding that Relators were not "original sources" of the information underlying their allegations; (5) starting his analysis from the false premise that Relators allege *all* claims submitted by CFS were false; (6) finding that Relators failed to sufficiently allege the particular content of false certifications; (7) requiring Relators to itemize particular dates and amounts of individual claims to satisfy Rule 9(b); and (8) finding that Relators failed to sufficiently allege that

any false claims were actually made. (Pls./Relators' Objections 2.) Relators attempt to bolster these objections with some thirty additional pages of exhibits, over twenty of which were never presented to the Magistrate Judge.[9]

## II.

The Court reviews *de novo* any part of the Magistrate Judge's report and recommendation to which a party has properly objected. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C). A reviewing court may accept, reject, or modify, in whole or part, the Magistrate Judge's recommended disposition. *Id.*

## III.

Relators' and Defendants' various objections coalesce into two overarching issues: (1) whether this Court has subject matter jurisdiction, and (2) whether Relators have pleaded their claims with sufficient particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Because the action must be dismissed if subject matter jurisdiction is lacking, *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009), this Court first addresses whether Relators have established subject matter jurisdiction.

### A.

Where a defendant challenges the existence of the factual basis for subject matter jurisdiction, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence. *Vuyyuru*, 555 F.3d at 347. So long as the jurisdictional facts are not intertwined with the facts central to the merits of the suit, the court may go

---

[9] The other ten pages of Relators' supplemental exhibits consist of transcript excerpts from the hearing before the Magistrate.

beyond the face of the complaint and consider extrinsic evidence, such as affidavits, in order to resolve the disputed jurisdictional facts. *Id.* at 348; *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) ("A trial court may consider evidence by affidavit, depositions, or live testimony without converting the proceeding to one for summary judgment.").

Defendants assert that this Court lacks jurisdiction over the counts based on fact patterns one through three because Relators' claims are foreclosed by the FCA's public disclosure bar, codified at 31 U.S.C. § 3730(e)(4). Section 3730(e)(4)(A) provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).[10] In other words, the statute deprives courts of jurisdiction over actions "based upon" disclosures previously made public through an enumerated variety of channels, unless the relator qualifies as an "original source" of the information. *See Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1401–02 (2010).

The overwhelming majority of the federal courts of appeals have interpreted this section to mean that "a *qui tam* action is 'based upon' a public disclosure whenever the

---

[10] Congress recently amended the public disclosure bar in the Patient Protection and Affordable Care Act (PPACA). *See* Pub. L. No. 111-148, 124 Stat. 901 (Mar. 23, 2010). All references to § 3730(e)(4) in this opinion, however, refer to the statute as it existed when Relators filed suit, because PPACA made no mention of retroactivity. *See Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010).

allegations in the suit and in the disclosure are the same, 'regardless of where the relator obtained his information.'" *See Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1044–47 (8th Cir. 2002) (adopting majority rule and collecting cases from the Second, Third, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits).

The Fourth Circuit, however, has held that an action is "based upon" and thus barred by a prior public disclosure only "where the relator has *actually derived* from that disclosure the allegations upon which his *qui tam* action is based." *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994) (emphasis added).

Under the majority view, Relators' claims would no doubt be barred by Section 3730(e)(4)(A). Nevertheless, this Court is bound to apply Fourth Circuit precedent, and thus jurisdiction is proper if Relators show that they did not actually derive their allegations from prior public disclosures of the types listed in Section 3730(e)(4)(A), or, alternatively, that they fall within the FCA's "original source" exception.

Judge Dohnal concluded that Relators failed to meet their burden as to Counts 1–6 and 16–19, which were based upon fact patterns one (preferred-lender agreements) and two (exit-loan counseling).[11] Relators object to this finding on various grounds.

i.

Relators first protest that the R&R proceeded from a false dichotomy—namely, that if Relators' knowledge was not derived from their employment at CFS, then it must have been derived from prior public disclosures. (*See* Mem. L. Supp. Pls.'/Relators'

---

[11] Counts 16–19 also incorporate fact patterns three and four—a fact of significance in this Court's subject matter jurisdiction analysis. *See infra* Part III.A.iii.

Objections Report Magistrate Judge [hereinafter Relators' Mem. L.] 3.) Relators contend that this premise was factually incorrect because Willoughby gleaned her knowledge about CFS's conduct not only from her work at CFS, but also from her subsequent work in the student-loan industry. (*Id.* at 3–4 (citing Willoughby Aff. ¶¶ 5, 6, 10).)

Relators' objection is unpersuasive. First, Judge Dohnal's focus on Relators' work at CFS was eminently reasonable. Throughout this litigation, Relators have represented themselves as whistleblowers with inside information. Indeed, Jones explicitly stated in her sworn affidavit that "*[a]ll* of the information . . . used in helping to prepare, bring and explain this case I learned from *my actual work at CFS*." (Jones Aff. ¶ 7 (emphasis added); *see also id.* at ¶ 5 (stating the Jones knew CFS submitted claims for payment from her "personal knowledge, gained from [her] training and daily experience *at CFS*" (emphasis added).) Willoughby stated the same, adding only the cursory assertion that she also gained information from "other daily work in the federal student loan business." (Willoughby Aff. ¶ 10.) Given Relators' own emphasis on the knowledge they gained at CFS, they can hardly be heard to complain about the Court's focus on their work at CFS.

As to Willoughby's other work in the student-loan industry and any additional information obtained therefrom, Judge Dohnal gave due consideration to all facts before him. The only facts Willoughby claimed to have learned from her other work in the industry were that FFELP consolidation loans are guaranteed by the DOE; "one-hundred percent of such consolidation loans resulted in actual claims for federal money . . . being presented to the [DOE] for payment"; and that CFS used its loan servicer entity to submit

13

claims to the DOE on consolidation loans. (Willoughby Aff. ¶¶ 5–6.) Crucially, Willoughby never explained *how* she could have learned of CFS's alleged HEA violations or submission of false claims after leaving CFS's employ.

Recognizing the shortcomings in their evidence presented to Judge Dohnal, Relators now ask this Court to consider additional exhibits which they characterize as being of "critical importance." This Court declines to entertain Relators' untimely supplemental affidavit and exhibits. Relators have been on notice since May 25, 2010 that Defendants contest whether the allegations underlying Relators' claims were based upon prior public disclosures. Relators made a conscious decision not to explain the source of their allegations to the Magistrate Judge, instead relying on sworn rejoinders that they had not previously seen the disclosures at issue. Relators' refusal to explain the source of their allegations continued even after the court clarified that, notwithstanding any ignorance on the part of Relators, their claims would be barred if their attorney, Mr. Matusheshki, contributed information in the public domain to the allegations in their Complaint.

Relators had ample opportunity to supplement the record before entry of the R&R. Indeed, Judge Dohnal explicitly asked whether they desired to put on evidence of subject matter jurisdiction beyond their original affidavits—an invitation which counsel declined. (Mot. Dismiss Hr'g Tr. 30:23–24, Sept. 1, 2010.) Relators have offered no justification for their failure to present this information to the Magistrate Judge, and this Court will not entertain additional evidence at this stage of the litigation. *See Doe v. Chao*, 306 F.3d 170, 183 n.9 (4th Cir. 2002) (finding no abuse of discretion where district court declined

to permit the presentation of supplemental affidavits after entry of R&R); 28 U.S.C. § 636(b)(1) (vesting discretion to receive further evidence in district court).

Because the Magistrate Judge appropriately considered Willoughby's other work in the student-loan industry, Relators' objection that the R&R erroneously focused exclusively on their work at CFS will be overruled.[12]

---

[12] Even if this Court considered Willoughby's untimely supplemental affidavit, the result would likely be the same, although it would be a closer case. Willoughby's supplemental affidavit, like Relators' original affidavits, fails to demonstrate the source of Relators' allegations. In her supplemental affidavit, Willoughby explains that she owned an independent consulting service called Graduate Funding Services ("GFS") between 2003 and 2006, whose clients competed with CFS for opportunities to secure student loan consolidation applications. (Pls./Relators' Objections Ex. A [hereinafter Willoughby Supp. Aff.] ¶ 10.) On behalf of GFS, Willoughby apparently contacted Pat Watkins, Director of Financial Aid at Eckerd College, in November 2006 and proposed that Eckerd's financial aid office enter into an agreement whereby GFS would pay to Eckerd more than $125 per Eckerd-graduate loan consolidation. (*Id.* at ¶¶13–15; Pls/Relators' Objections Ex. A-4.) In her e-mail to Watkins, Willoughby stated that she believed CFS offered similar agreements at lower rates. (*Id.*) Watkins responded that such inducements were illegal, and that she (Watkins) had served on the advisory board of Chase/CFS and had never heard of any payments to schools based on consolidation volume. (*Id.*)

Relators recounted different versions of this story in their Complaint and Amended Complaint. In Relators' April 30, 2007 Complaint, Relators alleged that CFS paid financial aid units per loan consolidation *application*, rather than per loan *consolidation* as Willoughby indicated in her e-mail to Watkins. (Compl. ¶ 20.) In the Amended Complaint, Relators for the first time alleged that CFS paid illegal inducements to alumni associations rather than to financial aid offices. (Am. Compl. ¶ 23.)

These changes (from the text of the e-mails to allegations in the Complaint, and again from the Complaint to the Amended Complaint and Supplemental Affidavit) parallel public disclosures that appeared in the news media after the filing of Relators' Complaint, but before their Amended Complaint—a fact of significance given that intervening public disclosures may trigger the public disclosure bar where new allegations appear in an amended complaint. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (noting that otherwise a relator would be "free to plead a trivial theory of fraud for which he had some direct and independent knowledge and later amend the complaint to include theories copies from the public domain or from materials in the Government's possession").

Willoughby's supplementary affidavit similarly fails to explain the basis of Relators' exit-counseling allegations. Willoughby simply asserts that, while working for University Financial Services ("UFS") between 2001 and 2003, she learned that some lenders had exclusive arrangements with colleges for the provision of exit-counseling services, and that CFS designed its online exit counseling to appear as though it had been authored or sponsored by the individual college or university. (Willoughby Supp. Aff. ¶¶ 7–9.) Willoughby also attaches a photograph

Relators next object that the SEC filings cited by CFS are not "administrative reports" capable of triggering the FCA's public disclosure bar. In Relators' view, the term "administrative report" in 31 U.S.C. § 3730(e)(4)(A) refers only to reports made by or at the direction of governmental agencies (*see* Pls./Relators' Objections 8), and thus the information gleaned from CFS's "Confidential Investor Presentation," which CFS filed with the SEC, cannot trigger the public disclosure bar.

This objection will be overruled for several reasons. First, the applicability of the public disclosure bar in this case does not turn on whether CFS's SEC filings are "administrative reports." Defendants' principally rely on the SEC disclosures in regard to the fifth pattern of practice alleged by Relators. The claims based on fact pattern five (Counts 13–15) have been withdrawn by Relators and are no longer at issue. Absent those claims, the SEC filings relate only to Relators' claims based on the first alleged pattern of practice (the preferred-lender agreements).

Defendants have pointed to numerous other public disclosures in the record which are sufficient to trigger the bar for Relators' preferred-lender agreement claims. (*See, e.g.*, Mem. L. Supp. Def.'s Mot. Dismiss, Exs. 4–8, 10, 11.) Indeed, the R&R addressed whether the SEC reports could properly be considered only because the information contained therein affected the weight of Relators' evidence, not because such reports

---

of herself holding a collegexit banner in a parade during the fall of 2000. The relevance of the photograph is unclear, and Willloughby's affidavit does not explain how she could have learned details the program's design after her termination from CFS while working for UFS.

Finally, even if Relators' untimely affidavits established subject-matter jurisdiction as to these fact patterns, their claims would nevertheless be dismissed for failure to satisfy Rule 9(b). *See infra* Part III.B.

were essential to finding that the public disclosure bar had been triggered. (*See* R&R 16 n.8.)

In any event, this Court agrees with Judge Dohnal. The Fourth Circuit has never interpreted "administrative" as requiring government authorship—either direct or indirect—in order to invoke the public disclosure bar. To the contrary, the Fourth Circuit in *United States ex rel. Grayson v. Advanced Management Technology, Inc.* held that a bid protest authored by a private company and filed with the FAA constituted an "administrative hearing" which triggered the public disclosure bar. 221 F.3d 580, 582 (4th Cir. 2000). Given that the Fourth Circuit has not imposed a government authorship limitation in the context of "administrative hearings," this Court cannot conclude that the Fourth Circuit would impose such a limitation in the context of "administrative reports." Further, the Supreme Court recently recognized in *Graham County Soil & Water Conservation Dist. v. United States ex rel Wilson* that "[i]t is the fact of 'public disclosure'—not Federal Government creation *or receipt*—that is the touchstone of § 3730(e)(4)(A)." 130 S. Ct. 1396, 1405 (2010) (emphasis added).[13] If the public disclosure bar required government *creation*, the *Graham County* Court would have had little reason to mention government *receipt*.

The cases cited by Relators—*United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 111 (2d Cir. 2010), and *United States ex rel. Ondis v. City of*

---

[13] The Court in *Graham County* addressed whether the term "administrative" extended both to federal forums and to "disclosures made in state and local sources," not whether § 3730(e)(4)(A) required government authorship. 130 S. Ct. at 1402. Nevertheless, the Court's emphasis on public availability via governmental sources buttresses this Court's view that reports publicly disclosed on a government site need not be authored by the government in order to trigger the FCA's public disclosure bar.

*Woonsockert*, 587 F.3d 49, 56 (1st Cir. 2009)—do not compel a different conclusion. Relators cite *Kirk* and *Ondis* for the proposition that an agency response to a FOIA request qualifies as an "administrative report" only if the document reflects the government's efforts to compile information to serve its own investigative or analytical ends. (Relators' Objections 8 n.8.) However, *Kirk* and *Ondis* turned not on whether the government's FOIA response was "administrative," but rather whether the response constituted a "report." *See Kirk*, 601 F.3d at 111; *Ondis*, 587 F.3d at 56.[14]

Moreover, Relators ignore the fact that SEC regulations *require* publicly traded companies to file Form 8-k and Form S-1. *See, e.g.,* 17 C.F.R. § 240.13a-11 (requiring filing of current report on Form 8-K); 17 C.F.R. § 229.101 (Form S-1 Registration Statement). In other words, CFS's 8-k and S-1 filings *do* reflect the government's efforts to compile information to serve its own analytical ends.

Accordingly, this Court concludes that CFS's SEC filings, which the government required CFS to file and which the government disclosed to the public on its website, constituted "administrative reports" within the meaning of § 3730(e)(4)(a).

iii.

Thirdly, Relators contend that Judge Dohnal erred by finding that Relators failed to prove their allegations were not actually derived from prior public disclosures. Relators assert that only three public disclosures were published prior to the filing of

---

[14] The Supreme Court recently granted *certiori* in *Kirk* to decide a circuit split as to "[w]hether a federal agency's response to a Freedom of Information Act request is a 'report . . . or investigation' within the meaning of the False Claims Act public disclosure bar." No. 10-188, 2010 U.S. LEXIS 5753 (Sept. 28, 2010).

Relators' original complaint, and that the disclosures which mentioned Defendants by name disclosed only limited information—namely, that (1) JPMorgan Chase was among the lenders from whom AG Cuomo requested information regarding their business practices; (2) CFS had mailed solicitations which referred to "Student Loan Department" and used an insignia similar to that of the DOE; and (3) CFS was among the third-party marketers of student loans lobbying for legislation to allow borrowers to consolidate loans with their lender of choice. Relators contend that a prior disclosure can bar jurisdiction only if it discloses the "allegation or transaction" on which the relator's claims are based. They add that "not one of the 'public disclosures' . . . pointed to by CFS in this case was specific or concrete enough about any conduct of any Defendant" to meet this standard. (Relators' Mem. L. 12.)

Certainly, Relators cannot mean to imply that the public disclosure bar is limited in application to a single comprehensive public disclosure which embraces each and every element of the alleged fraud. Surely even "parasitic plaintiffs," *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999), can piece together a series of disclosures. Indeed, Section 3730(e)(4)(A) refers to "news media" generally, rather than a "news article" or "news report," which leads this Court to the common-sense conclusion that Congress did not intend to bar only those actions derived entirely from a single disclosure.

In this case, the disclosures made public prior to the filing of Relators' complaint revealed far more than the three points recounted above by Relators. As to fact pattern one, at least the following facts were disclosed prior to the filing of Relators' complaint:

(1) CFS worked with schools' financial aid officers to increase awareness of its consolidation products and, as of July 2004, CFS had its product on 565 preferred-lender lists (disclosed July 13, 2004); (2) CFS paid to affinity groups a referral fee if solicitations resulted in a completed consolidation application (disclosed July 13, 2004); (3) CFS had a "distinct competitive advantage" over other FFELP consolidation loan lenders because of its 1,000+ school and affinity partnerships, which enabled CFS to reach graduating students before competitors (disclosed March 22, 2005); (4) financial aid offices compiled preferred-lender lists and engaged in revenue-sharing arrangements with those lenders (disclosed April 11, 2007, and April 25, 2007); (5) AG Cuomo announced on March 15, 2007, that colleges and universities accepted incentives such as cash payments based on loan volume in exchange for steering students toward certain lenders (disclosed March 16, 2007); (6) AG Cuomo publicly accused colleges of deceiving students on their loans by receiving referral fees and sharing revenue with lenders, and by soliciting money or benefits from lenders in exchange for inclusion on their preferred-lender lists (disclosed March 30, 2007); and (7) JPMorgan Chase was among the lenders under investigation by AG Cuomo (disclosed April 17, 2007). The essential elements of Relators' preferred-lender agreement allegations were clearly disclosed prior to the filing of their original complaint on April 30, 2007.[15]

---

[15] To the extent Relators ask this Court to consider only those disclosures which explicitly mention CFS by name, it must be remembered that "[i]ndustry-wide public disclosures bar *qui tam* actions against any defendant who is directly identifiable from the public disclosures." *United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006); *see also United States ex rel. Finley v. FPC-Boron Employees' Club*, 105 F.3d 675, 687–88 (D.C. Cir. 1997); *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995).

In addition, articles in *USA Today* and the *Wall Street Journal* on May 8, 2007, disclosed that JPMorgan Chase had entered into preferred-lender deals with alumni associations. Although these two disclosures were made after the filing of Relators' initial Complaint, they preceded Relators' Amended Complaint. Notably, Relators' allegations of illegal agreements with *alumni associations* first appeared in their Amended Complaint. In contrast, their original Complaint alleged agreements with *financial aid offices*. Under these circumstances, the intervening disclosures are capable of triggering the bar. Otherwise, a relator would be "free to plead a trivial theory of fraud for which he had some direct and independent knowledge and later amend the complaint to include theories copied from the public domain or from materials in the Government's possession." *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007).

As to the second pattern of practice, prior disclosures made public that CFS offered its exit counseling program, Collegexit, to 176 financial aid offices across the country (disclosed July 13, 2004); that CFS conducted online exit counseling, which is required by law for students who have taken out federally-guaranteed loans; and that CFS introduced this "consolidation product" to colleges and universities (disclosed April 21, 2007). Additional disclosures were made between the filing of Relators' Complaint and Amended Complaint, including a May 14, 2007 article which revealed that colleges employed CFS's Collegexit software (which CFS used as a vehicle for marketing its loan consolidation programs), and a June 14, 2007 Committee Report stating that, although it was illegal for lender-provided counseling services to include marketing pitches to

students, students were directed to Chase and CFS websites upon completion of their exit counseling.

Relators' original Complaint made no mention of "Collegexit" or of online exit counseling generally. The Complaint simply alleged that, as an inducement to financial aid units, CFS entered into agreements whereby CFS would place individuals at colleges and universities to purportedly act on behalf of the college in providing exit counseling, and the students' consolidation applications would be forwarded to CFS. (Compl. ¶ 20.) In contrast, the Amended Complaint included seventeen paragraphs concerning exit counseling, with a focus on online exit counseling. (*See* Am. Compl. ¶¶ 34–50.) The similarity between Relators' allegations in fact patterns one and two and the prior public disclosures is far more than coincidental.

More to point, Relators actually cited in their pleadings CFS's March 2005 "Confidential Investor Presentation" (*see* Compl. ¶ 20; Am. Compl. ¶ 21)—a presentation which CFS filed with the SEC and which was publicly disclosed prior to the filing of Relators' Complaint. Relators offer no explanation for how they could have learned of the presentation in their role as telemarketers or, in Willoughby's case, through her other work in the student-loan industry. To the contrary, Relators stated under oath that they first saw the presentation (and other disclosures cited by CFS) in 2010. (*See* Willoughby Aff. ¶¶ 7–10; Jones Aff. ¶6). The only logical inference is that counsel for Relators relied on the prior disclosure when preparing Relators' pleadings.

To rebut this inference, one of Relators' attorneys, Brad Pigott, submitted to Judge Dohnal a sworn declaration disavowing his reliance on prior public disclosures. (Decl.

Brad Pigott, Sept. 10, 2010 [hereinafter Pigott Decl.] ¶ 4.) Mr. Pigott emphatically denied using, relying on, or possessing any of the documents cited by Defendants when preparing Relators' complaints. However, given the glaring contradiction between Mr. Pigott's declaration and the complaints' explicit reliance on the presentation, Mr. Pigott later clarified that he "had been supplied" with information from the presentation prior to the filing of the complaint, but that he had no knowledge or belief in 2007 that such information was part of any public SEC filing. (*See* Letter from Brad Pigott, Counsel for Relators, to the Honorable Dennis W. Dohnal (Sept. 7, 2010).)

If Relators did not see the presentation until 2010, the only logical inference is that Mr. Matusheski—the attorney who recruited Mr. Pigott to serve as co-counsel in this litigation (Pigott Decl. ¶ 2)—obtained the presentation from CFS's SEC filing and "supplied" information from it to Mr. Pigott in 2007.[16] That inference is even more compelling considering Mr. Matusheski's history of recruiting employees who previously filed employment-related lawsuits against lenders and colleges to serve as *qui tam* relators in actions based on prior public disclosures.[17] Relators in this case, both of whom were terminated by CFS and previously filed discrimination lawsuits against CFS, appear to be similarly situated. (*See* Peyton-Scott Decl. ¶¶4, 5)

---

[16] The Court is not, as Relators contend, "[r]efusing to credit Relators' sworn denials that they had either read or used" prior public disclosures, (Relators' Mem. L. 10), nor is this Court ignoring Mr. Pigott's sworn declaration. Rather, this Court is crediting those assertions and drawing the only reasonable inference.

[17] Several courts, including one in this district, have dismissed cases brought by Mr. Matusheski under similar circumstances. *See, e.g., United States ex rel. Batiste v. SLM Corp.*, 2010 U.S. Dist. LEXIS 101368 (D.D.C. Sept. 24, 2010); *United States ex rel. Lopez v. Strayer Educ., Inc.*, 2010 U.S. Dist. LEXIS 25576 (E.D. Va. Mar. 18, 2010); *Schultz v. DeVry Inc.*, 2009 U.S. Dist. LEXIS 17015 (N.D. Ill. Mar. 4, 2010).

Moreover, Relators submitted to the Court a December 29, 2006 letter from Mr. Matusheshki to Assistant United States Attorney James Sheehan of the Eastern District of Pennsylvania, in which he explicitly cited CFS's Form S-1 filing and noted that the form was "available on www.SEC.gov." (*See* Relators' Resp. Opp'n Mot. Dismiss Ex. 8.) And in 2008, he faxed to Mr. Pigott one of the May 8, 2007 news articles cited by Defendants. Without explaining how they acquired their knowledge, Relators cannot overcome the inference that Mr. Matusheshki was keenly aware of the prior public disclosures which inevitably contaminated the process of drafting the Complaint.

To be clear, this Court is not concluding that every relator in a *qui tam* action must affirmatively establish the source of his or her knowledge. But in this case, the facts underlying Relators' complaint were previously publicly disclosed, and Relators had no logical access to that information via their positions of employment. Moreover, the evidence shows that Relators' original attorney relied upon those disclosures. Absent some credible explanation for how Relators learned of the allegations underlying fact patterns one and two, this Court must conclude that Relators failed to meet their burden.

iv.

Having found that Relators failed to prove that their allegations in fact patterns one and two were "based upon" sources separate from prior public disclosures, the Court now turns to the second prong of the Section 3730(e)(4)(A) inquiry, which asks whether Relators were "original source[s]" of the information supporting their claims.[18]

---

[18] Courts employ a two-step inquiry in assessing whether the public disclosure bar deprives the court of subject matter jurisdiction. First, the court asks whether the relator has established that

24

In order to qualify as an "original source," Relators must show that they had direct and independent knowledge of the information on which the allegations are based, and that they voluntarily provided that information to the Government before filing suit. 31 U.S.C. § 3730(e)(4)(B). "Only in this way will the district court be able to adequately identify legitimate *qui tam* actions and weed out parasitic plaintiffs who offer only secondhand information, speculation, background information or collateral research." *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162–63 (10th Cir. 1999); *see also Grayson*, 221 F.3d at 583.

On the "direct and independent knowledge" element, Relators must "allege specific facts—as opposed to mere conclusions—showing exactly how and when [they] obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *Hafter*, 190 F.3d at 1162–63. In other words, Relators must show that they gained their knowledge through their own efforts and did not derive those allegations from prior public disclosures. *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg. Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004). Importantly, a relator who is an "original source" for a single claim cannot piggyback on that claim to establish "jurisdiction in gross." Rather, a relator must establish her status as an original source as to each claim alleged in their Complaint. *Rockwell*, 549 U.S. at 476.

---

their allegations were not "based upon" prior public disclosures. Only if the relator fails to meet her burden on this point must the court proceed to the second step, which asks whether the relator was an "original source[s] of the information" supporting her claims. *See* 31 U.S.C. § 3730(e)(4)(A).

The Magistrate Judge concluded that Relators failed to establish they were "original sources" for the same reasons Relators failed to meet their burden on the first prong of the inquiry. (R&R 23.) "Indeed, it is the Relators' lack of convincing evidence of 'direct and independent knowledge' that weighs against their credibility in determination whether or not they have actually relied upon the prior public disclosures in asserting their claims." (*Id.*)

This Court agrees. Relators' affidavits do not evidence independent knowledge of the allegations in the Amended Complaint. Indeed, as this litigation has progressed, Relators have amended their complaint and submitted new affidavits which in fact track disclosures made public after Relators filed their original Complaint.[19]

For these reasons, this Court will adopt the Magistrate Judge's well-reasoned conclusion that Relators were not original sources of the information underlying their allegations, and Counts 1–6 must be dismissed for lack of subject matter jurisdiction.

---

[19] Even if Relators' affidavits showed direct and independent knowledge—which they do not—the second prong of the "original source" analysis would require Relators to show that they "voluntarily provided the information to the Government before filing an action . . . based on the information." 31 U.S.C. § 3730(e)(4)(B).

In this case, Mr. Matusheski wrote to Assistant United States Attorney James Sheehan of the Eastern District of Pennsylvania on December 29, 2006. (*See* Relators' Resp. Opp'n Mot. Dismiss Ex. 8.) In that letter, however, Mr. Matusheski did not disclose the preferred-lender or exit-counseling agreements alleged in this case. Rather, he explained only that CFS *received* flat fees from *lenders* for each consolidation application (*versus paying* fees to *colleges and universities*, as Relators allege).

Relators' July 2007 meeting with the DOE and the DOJ similarly fails to satisfy this prong of the original-source inquiry. First, Relators have not provided any evidence concerning the content of their alleged disclosures to the government at this meeting. Rather, they simply state that "they explained all of the information and experiences which underlie their allegations." (Relators' Mem. L. 16 n.18.) Second, this meeting occurred well after Relators filed their Complaint in April 2007; the FCA plainly requires relators to voluntarily disclose the information to the government "*before* filing an action" based on that information. 31 U.S.C. § 3730(e)(4)(B) (emphasis added).

This does not, however, imply that subject matter jurisdiction is lacking for Counts 16–19. Counts 16–19 are discussed in Part III.A.vi, below.

v.

Although Judge Dohnal recommended that the claims based on fact patterns one and two be dismissed for lack of subject matter jurisdiction, he concluded that Relators met their burden as to fact pattern three (misleading direct mail solicitations).[20] Because Relators explained that borrowers called to inquire about the direct-mail materials at issue and CFS trained them to respond that CFS was "licensed and backed by the federal government," Judge Dohnal found that Relators adequately demonstrated that their allegations concerning intentionally misleading advertising were not derived from public sources.

Defendants take issue with this conclusion. Defendants point to a March 2007 article in *U.S. News & World Report* which disclosed that loan companies "increasingly send solicitations that resemble actual loan documents or government-issued letters," and that:

> Collegiate Funding Services, part of JPMorgan Chase, sends solicitations marked "final attempt" in red on the envelope. The letter inside says it is from the "Student Loan Department" and bears an insignia with a book and leaves inside a circle within a circle. The federal Education Department's insignia is a tree within a circle inside a circle.

---

[20] Defendants do not challenge subject matter jurisdiction as to fact pattern four.

(Def.'s Mot. Dismiss Ex. 26.) The article also disclosed that complaints had been filed with the DOE's federal student aid ombudsman about these mailings, and that the potential existed for lawsuits against lenders for deceptive marketing practices. (Id.)[21]

Defendants compare these disclosures to Relators' allegations that CFS marked materials with "Final Notice" or "Student Loan Notification" to cause the misimpression that CFS was an official government body. They contend that the two are nearly identical. In Defendants' view, Relators' claims about the calls and training they received at CFS neither describe how Relators learned of the alleged misrepresentations (e.g., how they knew the actual words used on the envelopes), nor do they suggest how Relators could have known of any intent to deceive. Given the similarities between Relators' allegations and the prior disclosure, as well as the apparent gaps in Relators' knowledge, Defendants contend that Relators failed to overcome the public disclosure bar. Relators respond that the language in their Amended Complaint and the terminology described in the article was similar but not identical, therefore a strong inference exists that Relators did not derive their allegations from the article.

Relators' contention that slight discrepancies in terminology are dispositive is unpersuasive. If that were the case, parasitic plaintiffs could easily derive their allegations from public disclosures, alter a few words, and subvert the public disclosure bar in the Fourth Circuit.

---

[21] Defendants also cite a 2002 article in the *Chronicle of Higher Education* which questioned misleading direct-mail marketing practices by third-party marketers such as CFS.

However, this Court agrees that Relators have met their burden as to fact pattern three. It is plausible that, even if Relators were not involved in the design process, callers may have referenced the markings when inquiring about mailings. Furthermore, if Relators were trained to respond falsely that CFS was licensed and backed by the federal government, an intent to deceive could reasonably be inferred. At this stage, the Court must assess only whether Relators have established subject matter jurisdiction, not the separate question of whether Relators have affirmatively proved their allegations. While Relators' assertions may not suffice to prove their claim on the merits, they are sufficient to overcome the public disclosure bar.

vi.

With respect to Counts 20 and 21, the Magistrate Judge found that jurisdiction was proper, but recommended dismissal for failure to state a claim. Count 20 alleges that CFS caused false certifications to be used to avoid obligations to repay government insurance payments. (Am. Compl. ¶¶ 155–58.) In Count 21, Relators allege that CFS caused false certifications to be used to avoid obligations to repay government interest and special allowance payments. (*Id.* at ¶¶ 159–62.) The grist of these counts is that CFS allegedly used false claim-form certifications and loan verification certificates to maintain its status as an "eligible lender" under the FFELP. (*Id.* at ¶¶ 157, 161.)

Defendants contend that Counts 20 and 21 should be dismissed for lack of subject matter jurisdiction rather than failure to state a claim. They posit that the R&R's failure to recommend dismissal on jurisdictional grounds may have been a clerical error. (Def.'s Objections 2, 8.)

On close review, it does not appear that a clerical error occurred. Rather, it appears that Defendants disagree about the effect of dismissing some claims for lack of subject matter jurisdiction. In Defendants' view, if this Court lacks jurisdiction over some of the claims, then it lacks jurisdiction over Counts 20 and 21, which incorporate those claims by reference. This Court disagrees.

Although the Fourth Circuit in *Vuyyuru* remarked that Section 3730(e)(4) bars "actions even partly based on prior public disclosures," *Vuyyuru*, 555 F.3d at 351, the case law makes clear that "district courts should assess jurisdiction on a claim-by-claim basis, asking whether the public disclosure bar applies to each reasonably discrete claim of fraud." *United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1176 (10th Cir. 2007) (cited with approval in *Vuyyuru*, 555 F.3d at 351). In this case, Counts 20 and 21 could stand independently if Relators prove any one of the four alleged fact patterns (provided, of course, that Relators also prove the additional elements of 31 U.S.C. § 3729(a)(7)). Accordingly, Defendant's objection will be overruled.

For the same reasons, this Court cannot concur with the Magistrate Judge's recommendation concerning Counts 16–19. The R&R recommended dismissal of Counts 16–19 for lack of subject matter jurisdiction because they incorporate fact patterns one and two. However, the various fact patterns alleged by Relators are independent bases— not interdependent components—of the claims asserted in Counts 16–19. Because this court has jurisdiction over fact patterns three and four, Counts 16–19 also survive the subject matter jurisdiction analysis.

In sum, Counts 1–6 will be dismissed for lack of subject matter jurisdiction, but jurisdiction is proper as to Counts 7–12 and 16–21, which are based on fact patterns three and four.[22] This Court now turns to whether Relators have pleaded those claims with sufficient particularity.

## B.

Because False Claims Act cases essentially sound in fraud, the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure apply. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). Accordingly, Relators must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).[23]

Rule 9(b) serves four purposes: First, the rule works to ensure that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) ("*Harrison I*"). Second, it protects defendants from frivolous suits. *Id.* Third, it serves to eliminate fraud actions in which all the facts are learned after discovery. *Id.* Finally, it protects defendants from harm to their goodwill and reputation. *Id.*

Although 9(b)'s demands vary depending on the facts of each case, a plaintiff must set forth "the 'who, what, when, where, and how' of the alleged fraud" before access to discovery should be granted. *Wilson*, 525 F.3d at 379 (quoting *United States ex*

---

[22] Because Defendants have preserved their right to appeal the *Siller* standard for raising the public disclosure bar, the Court notes that Relators' claims based on fact pattern three would be barred under the majority interpretation "based upon," as used in § 3730(e)(4).

[23] "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." Fed. R. Civ. P. 9(b).

*rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)).  A plaintiff's failure to comply "with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison I*, 176 F.3d at 783 n.5.

i.

Relators first fault the R&R's "repeatedly stated misunderstanding" that Relators allege *all* claims for which CFS submitted a claim to the DOE would result in false claims.  (Relators' Mem. L. 16.)  According to Relators, this premise was erroneous because Relators claim only that "particular claims 'on consolidation loans made with students or graduates of schools (or their affiliates or employees)[,] which were the subject of inducement promises and payments' specifically described as violating federal statutes (and thus rendering factually false the certificates of compliance made with those specific claims)[,] were legally false." (*Id.* at 16–17.)  Although Relators do not explicitly state the effect of this purported misunderstanding, the implication is that Relators believe they target a class of claims sufficiently narrow to satisfy Rule 9(b).

Judge Dohnal did remark, as Relators contend, that Relators "explained that only those loans on which the borrower ultimately defaulted would result in a claim being submitted.  Thus, the Court understands Relators' position to be that one-hundred percent of those loans for which CFS submitted a claim would result in False Claims Act liability." (R&R 12 n.7 (emphasis omitted)).  The balance of the analysis, however, suggests that Judge Dohnal fully grasped the class of claims to which Relators referred.[24]

_____

[24] That said, the class of claims is not as narrow as Relators would have this Court believe.  For example, in fact pattern four, Relators allege that CFS offered per-application bonuses to its

32

Relators next object to the Magistrate's finding that they failed to plead with particularity the alleged false certifications, which Relators contend violated 31 U.S.C. § 3729(a)(2). Relators maintain that they satisfied Rule 9(b) by attaching a blank FFELP claim form and describing Defendants' alleged HEA violations. (Relators' Mem. L. 17–19.)

Central to Relators' position is the difference between 31 U.S.C. § 3729(a)(1) and § 3729(a)(2). Whereas subsection (a)(1) prohibits persons from "knowingly present[ing], or caus[ing] to be presented, to . . . the United States Government . . . a false or fraudulent claim for payment or approval," subsection (a)(2) imposes liability on a defendant who "knowing makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."

Relators argue that, because subsection (a)(2), unlike (a)(1), does not require presentment of a claim, Defendants can be liable under (a)(2) even if no claims were ever submitted to the government. (Relators' Mem. L. 18.) In support, Relators cite *Allison Engine Co. v. United States ex rel. Sanders*, in which the Supreme Court remarked that the language "to get" in (a)(2) refers not to the submission of a claim, but to "a defendant's purpose in making or using a false record or statement." 553 U.S. 662, 672 (2008).

---

telemarketers, and that any certification of compliance resulting from loans so-solicited resulted in false claims. (Am. Compl. ¶¶ 61–68.) This allegation would appear to cover a sea of consolidation loans secured by CFS.

Relators fail to appreciate the context of the Court's analysis in *Allison Engine*. At issue there were false documents submitted by subcontractors to two shipbuilders under contract with the United States Navy. *Id.* at 665–66. The Navy had contracted with the shipyards to build destroyers in compliance with the Navy's military standards. *Id.* at 666. The contractors subcontracted with Allison Engine and others to manufacture power generators for the destroyers. *Id.* The subcontractors were required to submit with each generator a certificate of conformance ("COC") certifying that the unit was manufactured in accordance with Navy standards. *Id.* Two former subcontractor employees filed a *qui tam* action under FCA Sections 3729(a)(1)–(a)(3), alleging that the subcontractors submitted to the shipyards invoices which fraudulently sought payment for work that was not done in accordance with contract specifications. *Id.*

The relators in *Allison Engine* introduced evidence that the subcontractors had issued COCs falsely certifying compliance with Navy standards, and that they had presented invoices for payment to the shipyards. *Id.* The relators did not, however, introduce invoices submitted from the shipyards to the government. *Id.* at 667. The district court granted judgment as a matter of law for the subcontractors, reasoning that the FCA required relators to prove false claims were presented to the government. *Id.* The Sixth Circuit reversed in part, finding that intent to cause a false claim to be paid by a private entity using government funds was sufficient for liability under subsection (a)(2). *Id.* at 668.

The Supreme Court reversed. *Id.* at 665. Addressing the relationship required between the making of a "false record or statement" and the payment or approval of "a

false or fraudulent claim . . . by the Government," the Court held that "'to get' denotes purpose, and thus a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order to be liable under § 3729(a)(2)." *Id.* at 665, 668–69 (quoting 31 U.S.C. § 3729(a)(2)).[25] "This does not mean, however, . . . that § 3729(a)(2) requires proof that *a defendant's* false record or statement was submitted to the Government." *Id.* at 671 (emphasis added). The Court noted that:

> What § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.' Therefore, a subcontractor violates § 3729(a)(2) if the subcontractor *submits a false statement* to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim.

*Id.* (emphasis added). It was in this context—a defendant submitting to a third party a false statement as a precursor to the third party's government claim—that the Court held a defendant can be liable under (a)(2) without itself submitting a claim to the government.[26]

---

[25] The Court also held that the defendant must intend for the claim to be paid by the government, not merely with government funds. *Id.* at 669.

[26] In response to *Allison Engine*, Congress amended the FCA to omit the "to get" language, instead imposing liability where a defendant "knowingly makes . . . a false record or statement that is 'material to' a false or fraudulent claim." Pub. L. No. 111-21, § 4(a), 123 Stat. 1617, 1621. The amending Act provided that this change "shall take effect as if enacted on June 7, 2008, and apply to all claims . . . that are pending on or after that date." *Id.* § 4(f)(1), 123 Stat. at 1625. This Court reads "claim" to mean "any request or demand . . . for money or property," as that term is defined in 31 U.S.C. § 3729(b)(2)(A). Although Relators' case was pending on and after June 7, 2008, Relators do not allege that any claims were pending on or after that date. Therefore, this Court applies § 3729(a)(2) as it existed when Relators filed suit. *See Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1323 n.2 (11th Cir. 2009), *cert. denied United States ex rel. Hopper v. Solvay Pharms., Inc.*, 2010 U.S. LEXIS 5167 (June 21, 2010) (discussing the retroactivity of § 3729(a)(2)'s amendments).

The facts of this case are simply not analogous. Relators do not allege that Defendants caused false claims to be made by third parties. To the contrary, they allege that Defendants presented the false claims in violation of § 3729(a)(1). (*See, e.g.*, Am. Compl. ¶ 28.) Relators further contend that Defendants violated § 3729(a)(2) by virtue of the same conduct they claim violated § 3729(a)(1). (Am. Compl. ¶¶ 127–42).

If Defendants did not submit the allegedly false certifications to someone (in anticipation of transmittal to the government), it is unclear how Defendants could have "use[d], or cause[d] to be . . . use[d], a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2). Indeed, although the subcontractors in *Allison Engine* did not submit false certifications to the government, they did submit those certifications to the contractors knowing that the ultimate claim for payment would be made to the government. *See Allison Engine*, 553 U.S. at 671.

The Eleventh Circuit in *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318 (11th Cir. 2009), *cert. denied United States ex rel. Hopper v. Solvay Pharms., Inc.*, 2010 U.S. LEXIS 5167 (June 21, 2010), recently rejected the very argument advanced by Relators in the case at hand. In fact, the Eleventh Circuit went a step further and held that liability under § 3729(a)(2) requires not only that a claim was submitted, but also "that the government *in fact paid* a false claim" to the defendant or to a third party. *Id.* at 1327,

1329 (emphasis added).[27] The Eleventh Circuit reasoned in part that "the submission of a

false claim is the '*sine qua non* of a False Claims Act violation.'" *Id.* at 1328 (quoting

*United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

The Fourth Circuit has similarly recognized that FCA liability attaches "not to the

underlying fraudulent activity or to the government's wrongful payment, but to the 'claim

for payment," and thus the FCA "at least requires the presence of a claim—a call upon

the government fisc—for liability to attach." *Harrison I*, 176 F.3d at 785.

Moreover, the certifications at issue could not have been "false" unless and until

they were submitted to the guarantor. The claim-form certification explicitly provided

that "*[b]y submitting this claim* to the guarantor for reimbursement, the lender/holder

certifies . . . that the information in this claim is true and accurate and that the loan(s)

included in the claim was (were) made, disbursed . . . and serviced in compliance with all

federal regulations and appropriate guarantor rules." (Am. Compl. Ex. A (emphasis

added).) It is illogical that Congress could have intended to impose FCA liability on

persons who possess—but never in fact use—a form which could be considered false if

submitted under certain circumstances.

In sum, Relators' submission of a blank certification form, with no facts

supporting an inference that it was the basis of a false claim, does not satisfy Rule 9(b)

with respect to their § 3729(a)(2) claims.

---

[27] The Court did not, however, hold that actual payment of a false claim is essential for liability
under § 3729(a)(1), which may violated by the mere submission of a claim. *Hopper*, 588 F.3d at
1329 n.5.

iii.

Relators next contend that Rule 9(b) can be satisfied by pleading a fraudulent scheme, and thus Judge Dohnal erred by requiring them to particularize dates and amounts of individual claims. (Relators' Mem. L. 21.)[28] This misconstrues the Magistrate Judge's construction of the law.

Judge Dohnal did not conclude that Rule 9(b) uniformly requires an FCA complaint to include the dates and amounts involved in the individual claims. Rather, he correctly found that Relators in this case "have failed to identify any specific defaults, payments, dates, *or other indicia from which a specific claim for payment can be reasonably inferred.*" (R&R 27 (emphasis added).) Judge Dohnal noted that Relators could satisfy Rule 9(b) without identifying particular claims if they alleged "some details of the claims process" suggesting that actual claims were submitted. (R&R 30.) At bottom, Judge Dohnal merely asked Relators for some facts from which the Court could reasonably infer that CFS submitted at least one false claim.

Relators do not suggest that Rule 9(b) can be satisfied without such facts. Rather, they contend that they have satisfied this standard. In support, Relators cite several out-of-circuit cases for the proposition that Rule 9(b) does not require a relator to plead false claims with detailed particularity. (*See* Relators' Mem. L. 21, 24.)

---

[28] Relators further object that, even if they were required to itemize particular dates and amounts of claims for the alleged § 3729(a)(1) violations, their § 3729(a)(2) claims could not be dismissed on this ground because (a)(2) liability does not require the submission of any claim at all. (*See* Relators' Mem. L. 20, 20 n.24.) This Court has already rejected this argument. *See supra* Part III.B.ii.

Relators may be correct that, in some circumstances, Rule 9(b) can be satisfied by pleading with particularity a fraudulent scheme instead of describing discrete fraudulent claims. However, in addition to alleging particular details of a scheme to submit false claims, the complaint must also contain "reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009); *accord United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) ("[C]laims under the FCA need only show the specifics of a fraudulent scheme *and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme.*") (emphasis added); *Ebeid v. Lungwitz, 616 F.3d 993*, 996 (9th Cir. 2010), *cert denied* 2010 U.S. LEXIS 9456 (Dec. 6, 2010). Unlike the cases on which they rely, Relators have not provided any such supporting facts in this case.[29]

For example, in *United States ex rel. Lusby v. Rolls-Royce Corp.*, a former Rolls-Royce engineer alleged that Rolls-Royce falsely certified to the United States that its T56 engines conformed to the government's specifications. 570 F.3d 849, 550 (7th Cir.

---

[29] After entry of the R&R, the United States—which elected not to intervene in this *qui tam* action—filed a Statement of Interest "respectfully submit[ting] . . . that it is possible for a relator (or the government) to describe an allegedly fraudulent scheme with sufficient specificity to satisfy Rule 9(b) without specifically identifying any false claims." (United States' Statement Interest 1–2.) Defendants did not move to strike the government's position paper, which was submitted after the close of briefing and without leave of court.

In any event, the government's position is fully consistent with this Court's opinion. The government submitted that the requirements of Rule 9(b) are satisfied "[s]o long as the complaint as a whole identifies the specifics of a fraudulent scheme *and provides an adequate basis (statistical or otherwise) for reasonable inferences that false claims were more than likely submitted to the Government because of that scheme.*" (*Id.* at 2 (emphasis added).) The government took no stance on whether these Relators have provided such an adequate basis (*see id.* at 1, 3), and this Court concludes they have not.

39

2009). Relator Lusby described (1) five specific contracts between the government and Rolls-Royce that required all engine parts to meet particular specifications; (2) how the engines did not so conform; (3) specific parts shipped on specific dates; and (4) details of payment. *Id.* at 853–54. The Seventh Circuit found the complaint sufficient despite the fact that Lusby did not produce the invoices (i.e., the claims for payment) themselves, because false claims could be inferred from the specific contracts, dates, and actual payments pleaded in the relator's complaint. *Id.* at 854.

Likewise, the Fifth Circuit in *United States ex rel. Grubbs v. Kanneganti* found that the relator satisfied 9(b) because he "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors . . . attempted to bring him into the fold of their on-going fraudulent plot"; described nursing staff's attempts to assist him in recording face-to-face physician visits that had not occurred; and alleged specific dates on which each defendant doctor falsely claimed to have provided services to patients, often even listing the type of medical service (or its billing code) purportedly provided. 565 F.3d 180, 191–92 (5th Cir. 2009).[30]

In short, the complaints in each fraudulent-scheme case cited by Relators included considerable detail about the claims process. The relators in *United States ex rel. Lemmon v. Envirocare of Utah, Inc.* went so far as to provide the dates, numbers, and amounts of defendant Envirocare's requests for payment under its government contract,

---

[30] In *Grubbs*, the relator was a doctor who alleged that his employer hospital and other doctors fraudulently billed Medicare and Medicaid for services not performed. *See Grubbs,* 565 F.3d at 183.

as well as the names of persons responsible for submitting claims to the government. 614 F.3d 1163, 1169 (10th Cir. 2010).[31]

Relators here, however, do not allege any instances of payments made by the government, instances of default, or any other facts from which the Court could infer that Defendants actually submitted any false statements. Instead, Relators insist that their attachment of the blank FFELP claim forms suffices. This reasoning is flawed.

First, the certifications at issue do not attest to full compliance with federal law and regulations. Rather, each certification is specific to the loan or loans referenced in the relevant claim form or certification. (*See* Am. Compl. Ex. A. (certifying "that the information *in this claim* is true and accurate and that *the loan(s) included in the claim* was (were) made, disbursed . . . and serviced in compliance with all federal regulations and appropriate guarantor rules") (emphasis added); Am. Compl. Ex. B (certifying that "the information *on this form* is accurate and complete; (b) *Each loan listed* above is a legal, valid, and binding obligation of the borrower; [and] (c) *Each such loan was* made and serviced in compliance with all applicable laws and regulations") (emphasis added).)

Second, the simple fact that Defendants *could* submit such claims to the DOE does not permit the inference that Defendants *did* submit any such claims. Because Relators do not provide any facts from which the Court could infer the actual submission of claims, the Court certainly cannot reasonably extrapolate that Defendants submitted any

---

[31] Relators also cite two cases in which the relators' complaints were actually dismissed for failure to satisfy 9(b)—*United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493 (6th Cir. 2007) (en banc), and *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 996 (9th Cir. 2010), *cert denied* 2010 U.S. LEXIS 9456 (Dec. 6, 2010). Contrary to Relators' belief, these cases counsel against finding for Relators in this case.

*false* claims—i.e., claims "'on consolidation loans made with students or graduates of schools (or their affiliates or employees) which were the subject of inducement promises and payments' specifically described as violating federal statutes." (Relators' Mem. L. 16–17.)

The only offering by Relators to support their contention that Defendants submitted any claims to the DOE is their assertion that they have personal knowledge "false certifications were indeed used to get legally false claims paid." (Relators' Resp. Mot Dismiss 24.) Relators' purported "personal knowledge" amounts to nothing more than a naked assertion. They have not presented any facts supporting this contention. This is not surprising since Relators neither serviced nor processed any consolidated loans, provided any post-consolidation customer service, or had access to information regarding claims for government reimbursement submitted by CFS. (*See* Peyton Scott Decl. at ¶¶ 7, 9.) Relators' bald assertions that false claims were submitted and paid is insufficient to raise their entitlement to relief above a speculative level.[32]

---

[32] Relators contend in their untimely supplemental affidavits that they had access to the National Student Loan Data System ("NSLDS"). (*See* Willoughby Supp. Aff. ¶ 17; Pls/Relators' Objections Ex. B ¶ 3.) These assertions do not alter the Court's conclusion. First, Relators assert only that they "knew how to track" and were "able to learn" whether a borrower had defaulted and been the subject of claims for government funds; they never assert that they actually tracked any loans and/or actually learned of specific instances of default. Second, to the extent that Relators imply they tracked loans to learn such facts, they may have engaged in violations of federal law. *See* 64 Fed. Reg. 72384, 72395 (Dec. 27, 1999); Letter from Dear Colleague Letter GEN-05-06, (Apr. 8, 2005), *attached as* Ex. F to Def.'s Resp. Relators' Objections (strictly prohibiting access to and use of NSLDS for unauthorized purposes, listing authorized purposes such as submitting student enrollment information and determining Title IV student-aid eligibility). Notably, a plaintiff's violation of conscience, good faith, or other equitable principle can bar him from recovering on a directly-related cause of action. *See Mas v. Coca-Cola Co.,* 163 F.2d 505, 507–09 (4th Cir. 1947).

## IV.

For the reasons stated above,[33] this Court will adopt the Report and

Recommendation of the Magistrate Judge, with the exception that Counts 16–19 will be

dismissed for failure to state a claim. Relators' Amended Complaint will be dismissed

with prejudice, and Relators will be denied leave to amend.

An appropriate Order will accompany this Memorandum Opinion.

/s/
          Henry E. Hudson
United States District Judge

Date: Jan. 12, 2011
Richmond, VA

---

[33] Because Relators have not provided any reliable indicia from which this Court could infer that any claims were submitted as part of a fraudulent scheme, the Court need not reach the additional grounds for dismissal raised by Defendants—namely, that (1) Relators lack Article III Standing to sue JPMorgan Chase because JPMorgan Chase is a passive holding company; (2) Relators failed to plead with particularity examples of express false certifications; (3) Relators failed to plead with particularity that certifications of compliance were material to the payment of claims; (4) Relators' allegations of *per se* liability as to CFS-Suntech do not permit them to circumvent Rule 9(b)'s pleading requirements; (5) Relators failed to plead with particularity the alleged violations of the HEA; (6) Relators failed to plead with particularity the formation of the alleged conspiracy; (7) per-application bonus payments and referral fees are not unlawful; and (6) lender-provided exit counseling is not unlawful.